# EXHIBIT 1

## Page 1

```
IN THE UNITED STATES DISTRICT COURT
      DISTRICT OF MARYLAND
LATASHA M. COTTON          :
     Plaintiff             :   Case No.
v.                         :   05-1047
DISTRICT OF COLUMBIA,      :
et al.                     :
     Defendant             :
     --------------

     Deposition of Officer David C. Wallace
          Silver Spring, Maryland
          Thursday, April 12, 2007
               10:30 a.m.




Job No: 1-100368
Pages: 1 through 143
Reported by: Patricia G. Koong
```

## Page 2

     Deposition of Officer David C. Wallace held at the offices of:

     DuBoff & Associates, Chartered
     8401 Colesville Road
     Suite 501
     Silver Spring, Maryland  20910
     (301) 495-3131


     Pursuant to notice, before Patricia G. Koong, Certified Court Reporter and Notary Public in and for the State of Maryland.

## Page 3

          A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
     DONNA W. RUCKER, ESQUIRE
     DuBoff & Associates Chartered
     8401 Colesville Road
     Suite 501
     Silver Spring, Maryland 20910
     (301) 495-3131


ON BEHALF OF DEFENDANTS:
     DAVID JACKSON, ESQUIRE
     Office of the Attorney General
     for the District of Columbia
     One Judiciary Square
     441-4th Street, NW
     Washington, DC  20001
     (202) 724-6618


     Also Present: Latasha M. Cotton, Plaintiff

## Page 4

          C O N T E N T S
EXAMINATION OF OFFICER DAVID C. WALLACE:
     By Ms. Rucker             5

          E X H I B I T S
     (Exhibits attached to the transcript.)
WALLACE DEPOSITION EXHIBITS              PAGE
1    Incident Based Event Report    69
2    Officer/Complainant
     Witness Statement              120
3    Event Chronology               120
4    Event Chronology               120

5

1        PROCEEDINGS
2        Officer David C. Wallace,
3   having been duly sworn, testified as follows:
4        EXAMINATION BY COUNSEL FOR PLAINTIFF
5   BY MS. RUCKER:
6        Q   Officer Wallace, my name is Donna Rucker,
7   I'm an attorney for Latasha Cotton, and we have you
8   scheduled here today to take your deposition. Have
9   you ever had your deposition taken before?
10       A   Once before.
11       Q   For what kind of matter?
12       A   Traffic.
13       Q   It was concerning a traffic case?
14       A   Juvenile.
15       Q   You were not involved in terms of an
16  interested party, you were a witness?
17       A   I was a juvenile.
18       Q   You were the juvenile?
19       A   I was a juvenile.
20       Q   Okay. I want to make sure I understand what
21  you're saying. Your deposition was taken when you
22  were a juvenile --

6

1        A   Yes.
2        Q   Concerning a traffic case?
3        A   Yes.
4        Q   About how many years ago was that?
5        A   Fifteen.
6        Q   Okay. Well, you have a little bit of
7   familiarity with how depositions go, but I'll take an
8   opportunity to suggest to you what we're going to do
9   here today is, I will ask you questions and I would
10  like for you to give me a response. And if for some
11  reason the question that I ask, if you're not sure
12  about it or if it's not clear, let me know that and
13  I'll be happy to rephrase it.
14       A   Okay.
15       Q   I want to make sure that when you give me an
16  answer, it's to the question that I posed.
17       A   All right.
18       Q   When you do give a response, because we have
19  the court reporter taking down what's being stated,
20  you need to give me a verbal response, because the
21  court reporter has difficulty picking up head nods or
22  head shakes.

7

1        A   Right.
2        Q   It also is good that I have an opportunity
3   to get the complete question out, and then I will
4   afford you a fair opportunity to give me a complete
5   response. But it become difficult for the court
6   reporter to take down what we're saying if we're
7   speaking across one another; is that fair?
8        A   Okay.
9        Q   If for some reason you don't understand one
10  of my questions, ask me to clarify the question. And
11  if I do that and you answer it, I'm going to assume
12  that you understood that question; is that fair?
13       A   Yes.
14       Q   If you need a take a break during the course
15  of the deposition, simply let us know that; I'll be
16  happy to oblige. I just ask that you not do so with a
17  question that's pending; is that all right?
18       A   Okay.
19       Q   Can you tell me for the record your name and
20  your business address?
21       A   First name is David, last name is Wallace,
22  W-A-L-L-A-C-E. I work for Metropolitan Police

8

1   Department, Washington D.C.
2        Q   What's that business address for you?
3        A   1805 Bladensburg Road, NE.
4        Q   What District is that?
5        A   Number 5.
6        Q   And have you ever gone by any other names?
7        A   No.
8        Q   Do you have a middle initial?
9        A   C.
10       Q   What does that stand for?
11       A   Cecil, C-E-C-I-L.
12       Q   And there is no junior or senior or II or
13  III?
14       A   The IV.
15       Q   So your complete name is David C. Wallace,
16  IV?
17       A   Yes.
18       Q   Have you ever been a member of the military?
19       A   No.
20       Q   Are you married?
21       A   Yes.
22       Q   To whom?

15 (Pages 57 to 60)

**Page 57**

1  himself in the mediation process?
2        MR. JACKSON:  Objection.
3        MS. RUCKER:  I'm only asking does he know.
4        MR. JACKSON:  And you already asked him if
5  he knew why and he said no.
6        MS. RUCKER:  Well, I gave him information
7  now, and I asked him about that.
8        MR. JACKSON:  Objection.
9  BY MS. RUCKER:
10    Q    Do you whether it was a part of the
11  mediation process?
12    A    No, I don't.
13    Q    Okay.  And do you know whether or not the
14  complaint was dismissed on its merits?  In other
15  words, let me rephrase that to you.  Do you know
16  whether the reason for the dismissal was that the
17  Civilian Complaint's Review Board found that there was
18  no merit to the claim?
19    A    I don't recall.
20    Q    Do you recall any action that was taken by
21  you as a result of the complaint made by Latasha
22  Cotton?

**Page 58**

1    A    I'm sorry.  What now?
2    Q    Do you recall any action that was taken by
3  you as a result of the complaint made against you by
4  Latasha Cotton?
5    A    Not that I recall.
6    Q    Do you recall any action taken by you as a
7  result of the complaint that was made by the taxicab
8  owner?
9    A    No, I don't.
10    Q    Do you have any knowledge of any action that
11  was taken by the Metropolitan Police Department as a
12  result of either of those two complaints?
13    A    No, I don't recall.
14    Q    Can you tell me how is it that you came to
15  arrive at the incident concerning Latasha Cotton in
16  June of '04?
17    A    Vaguely I remember that I was on patrol and
18  I pulled into Capitol Avenue where a large fight was.
19  Roughly 40, 50 people.  People in the street yelling,
20  screaming, fighting.  The vehicle got surrounded; had
21  to stop my vehicle so I wouldn't hit anybody.  I got
22  out and initiated to disperse the crowd.

**Page 59**

1    Q    Is that all you did?
2    A    I remember taking in a report for Ms. Cotton
3  at that time.  At this point in time I don't remember
4  what that report was for.
5    Q    Is that all that you remember?
6    A    Yes.
7    Q    You said that there was a large group of
8  people, about 40 or 50 people?
9    A    Yes.
10    Q    And you said the people were yelling and
11  screaming and fighting?
12    A    Yes.
13    Q    There were multiple people involved in the
14  fight?
15    A    Yes.
16    Q    About how many?
17    A    I don't recall.  I recall going up on the
18  block and there was numerous people fighting on the
19  street and the sidewalk.
20    Q    And your testimony is that you actually
21  observed individuals involved in hitting each other
22  back and forth?

**Page 60**

1    A    Yes.
2    Q    More than one set of people?
3    A    Yes.
4    Q    Were males fighting or males and females --
5  let me rephrase that.  Did you see men as well as
6  women fighting?
7    A    I don't recall at this point in time whether
8  they were all men fighting or all women fighting.  I
9  remember going up the block and there were subjects
10  fighting.
11    Q    And what was the race of those individuals
12  that were fighting?
13    A    The race?  Well, I pulled in on the block,
14  all I remember is black people.
15    Q    And why do you say that there were about 40
16  or 50 people on the street?
17    A    There was a large group.  I'm approximating
18  40 to 50 people.
19    Q    But you didn't make a count of any kind?
20    A    No, I did not.
21    Q    What were the people yelling?
22    A    I don't recall.

Page 61

1   Q   What were they screaming?
2   A   I don't recall.
3   Q   And you said your vehicle was surrounded?
4   A   Yes.
5   Q   The black people surrounded the vehicle?
6   A   Numerous people, yes.
7   Q   Did they do anything to the vehicle?
8   A   Not that I can recall.
9   Q   Why did they surround the vehicle?
10  A   I have no idea.
11  Q   Were you able to get out of the vehicle?
12  A   Yes.
13  Q   Even with it surrounded?
14  A   Once my vehicle got surrounded, I exited and
15  I initiated to disperse the crowd.
16  Q   Okay. What did you do to initiate the
17  dispersement of the crowd?
18  A   Used loud verbal commands.
19  Q   What did you say?
20  A   I don't recall.
21  Q   What would you typically say in a situation
22  like that?

Page 62

1   A   Move on.
2   Q   Did the crowd move on?
3   A   Yes, I believe so.
4   Q   So they all dispersed when you said move on?
5   A   The majority, yes.
6   Q   Of the 40 or 50, if you say majority, how
7   many are we talking about dispersed?
8   A   Approximately half.
9   Q   What did the others do who remained?
10  A   I don't recall.
11  Q   That remained?
12  A   I don't recall.
13  Q   Was anyone still surrounding your vehicle?
14  A   No.
15  Q   Was anyone still fighting?
16  A   Not that I recall.
17  Q   When you got out of your vehicle, you
18  initiated the dispersement -- I don't want to say that
19  you said move along, because you testified you don't
20  recall what you said. You didn't use a megaphone, did
21  you?
22  A   No, I did not.

Page 63

1   Q   Of those individuals who remained, as you
2   stated, were any of them still fighting?
3   A   Not that I can recall.
4   Q   Did anyone get injured?
5   A   Not that I recall.
6   Q   Did anyone have a weapon?
7   A   I don't remember at this time, no.
8   Q   When you arrived and you say your vehicle
9   was surrounded, did you call for backup?
10  A   Yes, I tried to call for backup a couple of
11  times, but I was unable to get across the radio.
12  Q   Tell me what you mean by that.
13  A   I keyed the radio up and I asked for
14  assistance, to where I could remember twice, but I had
15  no response from the dispatcher or any other unit.
16  Q   And why is it that you allege you called for
17  backup?
18  A   Why did I call for backup?
19  Q   Why is it that you are stating here today
20  that you called for backup?
21  A   Why?
22  Q   Why.

Page 64

1   A   Because I was one officer in the middle of
2   the crowd of 40, 50 people.
3   Q   Did you fear for your safety?
4   A   Yes, I did.
5   Q   Why?
6   A   Why did I fear for my safety? Because there
7   was numerous people fighting in the street and I was
8   only one officer in the crowd of 40 to 50 people.
9   Q   So you say you tried about two times to get
10  the dispatcher's attention?
11  A   Yes.
12  Q   And did you -- what channel were you using
13  for this?
14  A   The 5th District police channel.
15  Q   Would this scenario be equivalent to any
16  training you may have received concerning riots or
17  rioting circumstances?
18  A   During a protest. If it was a protest, but
19  it wasn't a protest that I recall.
20  Q   Well, what I'm speaking about is the crowd
21  size and the allegation that you made about the
22  behavior of the people, would that be equivalent to

Page 65

1  what would be considered a riot or an unruly crowed
2  based on your training?
3     A   The riot training that I received was for
4  demonstrations.
5     Q   What would have been the protocol in a
6  demonstration with unruly people?
7     A   To disperse the crowd.
8        MR. JACKSON: Objection; relevance.
9  BY MS. RUCKER:
10    Q   To do what?
11    A   To disperse the crowd.
12    Q   Which is what you say you did?
13    A   Yes.
14    Q   Did you ever use the TAG channel to get
15 assistance?
16    A   No.
17    Q   Why not?
18    A   Because we don't operate off the TAG Channel
19 as the main dispatch channel.
20    Q   When you say you don't operate it as the
21 main dispatch channel, but it is you a channel that
22 you can use for communication, correct?

Page 66

1     A   Yes, it is.
2     Q   Aside from your testimony that you observed
3  40 to 50 people yelling and screaming and fighting,
4  did anyone make any advance towards you?
5     A   Not that I recall.
6     Q   Did you have to pull your revolver?
7     A   No, I don't remember pulling my duty weapon.
8     Q   Was there any particular thing said to you
9  that caused you to, as you stated, fear for your
10 safety?
11    A   Why was I in fear?
12    Q   No, my question is: Was there anything in
13 particular said to you that caused you to be in fear
14 for your safety?
15    A   Not that I can recall at this time.
16    Q   How long during the time that you were on
17 the scene were you in fear for your safety?
18    A   Until the crowd dispersed.
19    Q   And that's after you had exited the vehicle
20 and initiated the dispersement command?
21    A   Yes.
22    Q   This area that we're talking about where the

Page 67

1  incident occurred --
2        MS. RUCKER: For the record. I want to see
3  if we can get an agreement as to the location.
4  BY MS. RUCKER:
5     Q   Would it have been, I think it's 1723
6  Capital Avenue. Does that sound about right?
7     A   About.
8     Q   What PSA area is that?
9     A   At the time it was 507.
10    Q   507. And how is it that you were assigned
11 to that area that day?
12    A   I don't recall being assigned. I'm a police
13 officer. I travel the 5th District.
14    Q   That's what I wanted to hear. So you
15 weren't there for a particular assignment, you were
16 just doing a routine patrol?
17    A   As far as I can remember.
18    Q   So my initial question is: How is it that
19 you came to be at the scene? And what I was trying to
20 ascertain from you is, were you sent to this location
21 based on a radio call from communications putting out
22 a run to that location?

Page 68

1     A   No.
2     Q   Did you have any communications with your
3  fellow officers over the area concerning what you had
4  observed when you arrived at the incident?
5     A   Not that I recall, no.
6     Q   And you were not partnered, riding with a
7  co-worker that day?
8     A   No. I don't believe so.
9     Q   Do you recall that the individuals in this
10 crowd that you were speaking about were trying to give
11 you information about what may have been going on when
12 you arrived?
13    A   Not that I recall.
14    Q   You don't recall anyone giving you any
15 information?
16    A   No, I don't recall.
17    Q   When you got to this location, at what point
18 did you encounter Latasha Cotton?
19    A   I don't remember.
20    Q   You testified that you came up on the scene,
21 you saw the people that appeared to be yelling,
22 screaming, and fighting, you made a request to

**Page 73**

1  on your report. Having reviewed your report, which is
2  Deposition Exhibit Number 1, is there any basis in
3  that report that would have authorized you to arrest
4  Ms. Cotton?
5     A   Not that I recall.
6     Q   But I just want to be clear, you're going
7  from your recollection?
8     A   That's correct.
9     Q   But I don't want you to do that. I have a
10 report that I presented in front of you. And I would
11 like for you to review that report and tell me --
12         MS. RUCKER: Counsel, can you hand that back
13 to him just so he can review it again.
14 BY MS. RUCKER:
15    Q   Based on that report, can you tell me if
16 there's anything you read in that report that would
17 have authorized you to arrest Ms. Cotton?
18    A   No, not at this time.
19    Q   Isn't it true that your report actually
20 identifies her as a victim?
21    A   As a complainant.
22    Q   Would that be a victim?

**Page 74**

1     A   Complainant. It says complainant on the
2  report.
3     Q   Oh, I know what's written there, but as a
4  police officer, would you consider that person a
5  victim?
6     A   Yeah. Yes.
7     Q   And this person, Ms. Robinson, did you ever
8  speak to her at the scene of the incident?
9     A   No.
10    Q   Can you tell me why?
11    A   Because she wasn't on the scene.
12    Q   Did you conduct any investigation --
13    A   Yes, I did.
14    Q   -- while you were present? And I'm going to
15 let you answer. You said you did?
16    A   Yes.
17    Q   Can you tell me please, for the record, what
18 your investigation consisted of?
19    A   I interviewed Ms. Cotton.
20    Q   Is that it?
21    A   That's part of my investigation, yes.
22    Q   You said that's part -- I want to hear about

**Page 75**

1  what you did for your investigation.
2     A   My investigation included interviewing
3  Ms. Cotton, and then in my supplemental report, I
4  didn't have any additional information. And I also
5  canvassed the block, canvassed the two-block radius
6  with negative results.
7     Q   You said you canvassed as part of your
8  investigation a two-block area?
9     A   Yes.
10    Q   What were you canvassing doing?
11    A   What was --
12    Q   In other words, what were you doing when you
13 were canvassing the area as you say here?
14    A   Well, I was looking for a suspect, and the
15 suspect is a black female, approximately 28 years old,
16 5'11, 180 pounds, brown eyes, black hair, medium
17 complexion with white pants and a white shirt.
18    Q   Having read that, what I still need you to
19 do is tell me when you say in your report that you
20 canvassed the area?
21    A   Yes, I rode around the area looking for a
22 suspect.

**Page 76**

1     Q   Okay. Did you stop and talk to anyone?
2     A   Not that I recall.
3     Q   You testified that after you had exited your
4  vehicle and you made this, initiated this dispersement
5  command, that approximately half of the people would
6  remain. So that would give us anywhere from 25 to 20
7  individuals. Did you talk to any of them?
8     A   No, not at the time, no.
9     Q   Did you at any time ever talk to any of
10 them?
11    A   Not that I recall.
12    Q   Why?
13    A   I don't recall talking to anybody, no.
14    Q   No my question is, the next question that I
15 have is why would you not talk to the individuals that
16 were present on the scene?
17    A   I don't recall.
18    Q   And the negative results that you have
19 referenced here in Deposition Exhibit Number 1, is an
20 indication that as a result of your canvassing the
21 area, you didn't find anyone fitting that description?
22    A   Correct.

77

1  Q  Is that your testimony?
2  A  Correct.
3  Q  Did you ever canvass anywhere inside of the
4  building that the incident occurred in front of?
5  A  Not that I recall.
6  Q  Do you recall, Officer, that any of the
7  individuals who you've identified as individuals who
8  may have been screaming or yelling, do you recall
9  whether any of those individuals may have been
10 screaming or yelling, "There is Ms. Robinson. She has
11 the knife"?
12 A  No, I don't recall.
13 Q  You never heard that while you were present?
14 A  No, I don't recall.
15 Q  Did you hear it, or you don't recall that
16 you heard it?
17 A  I don't recall that I heard that.
18 Q  Okay. I'm looking at a section on this
19 report, it's entitled "Narrative." It's the last page
20 on the exhibit that I give you, Exhibit 1. And you
21 have written here, it says "No additional" -- and can
22 you tell me what that word is?

78

1  A  Information.
2  Q  What are you stating when you write that in
3  there?
4  A  That I didn't have any additional
5  information.
6  Q  Did you ask Ms. Cotton where Ms. Robinson
7  lived?
8  A  Yes, I did.
9  Q  And so wouldn't that be information that
10 would be relevant to that area?
11 A  Notated in the 251 or the 252, correction.
12 Q  Did you have any information from Ms. Cotton
13 as to the fact that Ms. Robinson had run back into the
14 apartment building after you arrived?
15 A  Not that I recall, no.
16 Q  Did you ever ask at any point where she
17 observed Ms. Robinson go after your arrival?
18 A  From what I wrote in my 251, she had no idea
19 were this suspect went, because she stated to me,
20 "When you pulled in the block, she ran somewhere."
21 Q  That indicated what she said to you once you
22 arrived. But my question is: In your investigation

79

1  of this, did you ask her whether she had any knowledge
2  as to where she ran?
3  A  I don't recall.
4  Q  I see also in the same form on the last page
5  it has a box that appears to be blackened. And it
6  says, "Investigate further." Do you see that?
7  A  Yes.
8  Q  What does that signify?
9  A  I forward the information to a detective.
10 Q  And which detective do you forward this
11 information to?
12 A  Detective Harris.
13 Q  And what information did you give him?
14 A  I gave detective Harris information that I
15 had for my report. The information I wrote in my
16 report.
17 Q  Did you ask Ms. Cotton for Ms. Robinson's
18 telephone number?
19 A  Not that I recall.
20 Q  And do you have any knowledge as to what
21 Detective Harris may have done based upon the referral
22 of the matter to him?

80

1  A  No.
2  Q  Do you have any recollection as to whether
3  Detective Harris ever came back to you regarding the
4  Latasha Cotton scenario?
5  A  Not that I recall.
6  Q  There are signatures that are identified on
7  this form. Can you tell me whose they are?
8  A  Which signature are you referring to?
9  Q  You can start either place.
10 A  You want to know how many signatures are on
11 there?
12 Q  Whose signature.
13 A  I have no idea.
14 Q  Did you sign this?
15 A  One of them is mine.
16 Q  Which one is yours?
17 A  Under "reporting officer signature."
18 Q  And does it say "reporting members"?
19 A  On the 251 it says "reporting officers."
20 Q  I'm looking at the last page again, sir.
21 The very last page that we were looking at.
22 A  "Reporting member's signature." That's

**Page 97**

1  A   Like I said, I can ask anything.
2  Q   Not unless you have the authority?
3  A   No, I can ask anything.
4  Q   Okay. But let me just be clear, because I
5  don't want to be argumentative. My question to you
6  is, and I can be more -- with no disrespect to you --
7  elementary in my presentation of it. Did you have any
8  authority that you have as a police officer of the
9  Metropolitan Police Department in lawful regulation or
10 procedure that would have authorized you to request
11 Ms. Cotton exit her apartment?
12 A   At this time, no.
13 Q   How about that time?
14 A   No, I don't recall.
15 Q   You don't recall what? Whether you had
16 authority?
17 A   I don't recall the situation, and I don't
18 recall anything to the nature of your question.
19 Q   I'll attempt to rephrase it in the event
20 that that helps you. The scenario that we're speaking
21 about is what's contained in your 251.
22 A   Okay.

**Page 98**

1  Q   Based upon that, would you have had any
2  authority to ask Ms. Cotton to leave her apartment?
3  A   Not that I recall.
4  Q   I'm not sure what you mean by recall.
5  You're reading the report. If you need time to look
6  at it --
7  A   It says nothing in here about having
8  Ms. Cotton exit or leave her premises.
9  Q   That I'm aware of. But what I'm asking you
10 is a different question. Based upon what you put in
11 your report, do you have a scenario under which you
12 would have been authorized to ask Ms. Cotton to leave
13 her apartment?
14 A   No, not at this time.
15 Q   What do you mean by this time?
16 A   No. The answer is no.
17 Q   Did you ever see Ms. Cotton's children in
18 her apartment?
19 A   Not that I recall, no.
20 Q   Did you ever do any kind of independent
21 investigation to ascertain whether or not Ms. Cotton's
22 children were in her apartment alone?

**Page 99**

1  A   Not that I recall.
2  Q   Did you call Child Protective Services?
3  A   No, I did not.
4  Q   Did you believe you needed to call --
5  A   No. Not that I recall.
6  Q   -- Child Protective Services.
7  A   No, not that I recall.
8  Q   Didn't an officer, I think by the name of
9  either Ida George come to the scene of the incident?
10 A   She was a sergeant at that time.
11 Q   Okay. Did the sergeant come to the scene of
12 the incident?
13 A   I don't recall if she did or not.
14 Q   But you do recall that she was a sergeant at
15 the time of the incident?
16 A   Correct.
17 Q   Did you search Ms. Cotton when you were at
18 the scene of incident?
19 A   Not that I recall.
20 Q   Did you search anyone?
21 A   Not that I recall.
22 Q   Confiscate any weapons?

**Page 100**

1  A   Not that I recall.
2  Q   Did you ever see Ms. Cotton with a can of
3  roach spray in her hand?
4  A   Not that I recall.
5  Q   Did you have to confiscate any can of roach
6  spray?
7  A   Not that I recall.
8  Q   Do you have any reference to a can of roach
9  spray in your report?
10 A   No, I don't.
11 Q   I think I asked you this, and we can move on
12 if I have. Do you recall handcuffing plaintiff at the
13 scene?
14 A   No, I don't recall that.
15 Q   Under what circumstances could you handcuff
16 an individual?
17 A   There's many reasons I can handcuff an
18 individual. To detain them if they're a threat to
19 themselves or a threat to others; while a police
20 investigation is going on; if they're going to be
21 arrested. There's many different reasons.
22 Q   Was Ms. Cotton arrested?