**EXHIBIT 2**

**Page 1**

1    UNITED STATES DISTRICT COURT
2    DISTRICT OF COLUMBIA
3    LATASHA M. COTTON,        :
4        Plaintiff,    : Civil Case No.
5        vs.        : 05-1047 (RU)
6    DISTRICT OF COLUMBIA,        :
7    et al,        :
8        Defendants.  :
9    - - - - - - -
10    DEPOSITION of LATASHA M. COTTON
11    Silver Spring, Maryland
12    Wednesday, April 18, 2007
13    3:26 P.M.
14
15
16
17    Job No: 1-101832
18    Pages 1 - 124
19    Reported by:  Barbara A. Conner, R.P.R.
20
21
22

**Page 2**

1        Deposition of LATASHA M. COTTON, held at the
2    offices of:
3
4    DUBOFF & ASSOCIATES, CHARTERED
5    8401 Colesville Road
6    Suite 501
7    Silver Spring, Maryland  20910
8    (301) 495-3131
9
10        Pursuant to Notice, before Barbara A. Conner,
11    Registered Professional Reporter and Notary Public of
12    the State of Maryland.
13
14
15
16
17
18
19
20
21
22

**Page 3**

APPEARANCES

1
2
3    ON BEHALF OF THE PLAINTIFF:
4        DONNA W. RUCKER, ESQUIRE
5        DUBOFF & ASSOCIATES, CHARTERED
6        8401 Colesville Road
7        Suite 501
8        Silver Spring, Maryland  20910
9        (301) 495-3131
10
11
12    ON BEHALF OF THE DEFENDANTS:
13        DAVID JACKSON, ESQUIRE
14        OFFICE OF THE ATTORNEY GENERAL
15        FOR THE DISTRICT OF COLUMBIA
16        441 4th Street, Northwest
17        Suite 600 South
18        Washington, D.C.  20001
19        (202) 724-6618
20
21    ALSO PRESENT:
22        Latasha Cotton

**Page 4**

CONTENTS

1
2
3    EXAMINATION OF LATASHA M. COTTON        PAGE
4        By Mr. Jackson            5
5        By Ms. Rucker            120
6
7
8        EXHIBITS
9    (No items were marked for identification.)
10
11
12
13
14
15
16
17
18
19
20
21
22

1 (Pages 1 to 4)

**5**

1    PROCEEDINGS
2    LATASHA M. COTTON,
3    having been duly sworn, testified as follows:
4    EXAMINATION BY COUNSEL FOR DEFENDANTS
5    BY MR. JACKSON:
6    Q    Miss, would you please state your full name
7    for the record and spell your last name, please.
8    A    Latasha M. Cotton.
9    Q    And is Latasha spelled capital L capital T or
10    is it all small letters?
11    A    Did you say capital L capital T?
12    MS. RUCKER:  Spell it.
13    A    L-A-T-A-S-H-A.
14    Q    L-A-T-A-S-H-A, right?
15    A    Yes.
16    Q    Good afternoon, Ms. Cotton.  I've seen you at
17    a number of proceedings involved in this case brought by
18    you, but let me, for the record, officially introduce
19    myself.  My name is David Jackson.  I'm an assistant
20    attorney general with the DC Office of the Attorney
21    General and I have been assigned to defend this civil
22    case that is brought by you against the District of

**6**

1    Columbia and Officer David Wallace.
2    During the course of this deposition, I know
3    that you've sat in the previous 30(b)(6) deposition, but
4    let me just explain some of the ground rules for this
5    deposition.
6    I will be asking you a series of questions.
7    My purpose of asking you these questions is so I can
8    learn everything that you know about this case.  As I am
9    asking these questions, there might come a time when you
10    may anticipate what my question may be, but if you do
11    anticipate them, would you please let me finish my
12    question before you give an answer?
13    A    Yes.
14    Q    And if I interrupt you during your answering
15    any of my questions, would you please let know that?
16    A    Yes.
17    Q    And because what you're saying and what I'm
18    saying is all being recorded by the court reporter, it's
19    important that you give verbal responses, so that nods
20    or shakes of the head or shrugs of the shoulders cannot
21    be accurately recorded.  So, will you give verbal
22    responses?

**7**

1    A    Yes.
2    Q    If I ask you a question and you do not
3    understand what my question is, would you let me know
4    that you don't understand it?
5    A    Yes.
6    Q    And if I ask you a question and you give me
7    an answer, then I'm going to assume that you understood
8    my question and that your answer is in direct response
9    to that question.  Is that fair?
10    A    Yes.
11    MS. RUCKER:  Excuse me, Dave.  I wanted to
12    tell you, David, I spoke with Ms. Cotton in preparation
13    for her and yesterday, when things got awry, I didn't
14    have a chance to deal with these before Susan left,
15    who's our notary, but Ms. Cotton reviewed her Answers to
16    Interrogatories and she noticed two things.
17    Number one, question number two, we've
18    supplemented here because it didn't go back as far as
19    your question called for, your question asked us to go
20    back five years in her medical history --
21    MR. JACKSON:  Okay.
22    MS. RUCKER:  -- we had only gone back to

**8**

1    2002, so this goes back to 2000, forward.
2    I misspoke, though.  Number two deals with
3    her work history.  Since she signed her earlier
4    interrogatories, she's gotten a new employer, so we
5    supplemented number two to tell you who that is.
6    And it's number six is the one that we've
7    added in terms of going back further.
8    And the final one is number seven is
9    supplemented.  I had Ms. Cotton, when she was looking at
10    it for me to do the supplemental answers, she pointed
11    out a miswrite in one of the sentences, so I corrected
12    that.  I handed it to you even though she hasn't
13    notarized it because she will before you leave.  Okay?
14    MR. JACKSON:  What's number 7?
15    MS. RUCKER:  Number 7.
16    MR. JACKSON:  That's where the miswrite is,
17    right?
18    MS. RUCKER:  Yes, and she corrected the
19    sentence.  What we did here is, we say in sentence
20    seven, it reads and it has the quote and then she says,
21    Ms. Cotton corrected it to say, and it has the quote "I
22    saw," so that's the part that she's correcting.

2 (Pages 5 to 8)

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

9

1    You know, we transcribe this from what the
2  clients tell us and I had written the way I understood
3  her to say the sentence and when she read it back she
4  said, "What I said was, I wanted to tell him such and
5  such," and I said, "Well, we can correct that, if that's
6  not what you meant to say."
7    The last one was a supplement to her response
8  where she directed you to interrogatory number seven and
9  that's number 11. That's the last one.
10    I can let you take a look at this and before
11  Susan leaves, she's our notary -- she left yesterday
12  before everybody got here. I'll also change the
13  delivery date because I anticipated handing that to you
14  as we got started yesterday and you know what yesterday
15  was like.
16    Q    Ms. Cotton, would you please state your
17  current address.
18    A    **309 34th Place, Northeast, Washington, DC,**
19  **20019.**
20    Q    And how long have you lived there?
21    A    **A year and three months.**
22    Q    And prior to that, where did you live?

10

1    A    **1732 Capitol Avenue, Northeast, Apartment 3.**
2    Q    And that's the address where you were living
3  on June 7 of 2004?
4    A    **No.**
5    Q    Let me back up a little bit. What is your
6  date of birth?
7    A    **1/27/81.**
8    Q    And your Social Security number?
9    MS. RUCKER: Objection. We're not going to
10  provide the Social.
11    MR. JACKSON: Why?
12    MS. RUCKER: Because of privacy issues.
13  There's so much that can be done with a Social Security
14  number. If you have why it's relevant --
15    MR. JACKSON: If I wanted to do a record
16  check, then I'm going to need Social Security numbers.
17    MS. RUCKER: If you wanted to do what?
18    MR. JACKSON: A record check.
19    MS. RUCKER: All right, I will provide it to
20  you off the record.
21    MR. JACKSON: Now, you can't --
22    MS. RUCKER: I'll provide it off the record,

11

1  it's not going to be a public record, and this is what
2  I've done in all of my depositions. If you want to go
3  off the record right now and have Ms. Cotton tell you
4  what her Social is, we can do that, but we don't want it
5  to appear in a public deposition record.
6    MR. JACKSON: We can keep this confidential,
7  that's fine, but I think I have a right to ask the
8  question.
9    MS. RUCKER: We're going to give it to you,
10  but we're just not putting it on the record. So, we'll
11  go off the record and let me give you the Social
12  Security number.
13    MR. JACKSON: Just note that in the record,
14  please --
15    MS. RUCKER: All of this is in the record.
16    MR. JACKSON: -- that they refuse to answer
17  the question.
18    MS. RUCKER: No, we're not refusing, we're
19  providing it off the record.
20    MR. JACKSON: Well, you provided me with
21  documents off the record, you provided me with
22  interrogatories, everything is off the record, but this

12

1  is a deposition.
2    MS. RUCKER: But, Mr. Jackson, please, let's
3  be civil.
4    That document that I just gave you is a
5  supplement that is required pursuant to the rules of
6  evidence, it is not done off the record.
7    And I don't have a problem at any point
8  during this deposition, this case or any other case that
9  I have with you, putting matters on the record. I don't
10  like the insinuation. And we will provide the Social
11  Security number, but we will not put it on the record.
12    Let's go off the record for one second.
13    (A discussion was held off the record.)
14    MS. RUCKER: I'll just note, as we're back on
15  the record, that off record Ms. Cotton provided counsel
16  with her Social Security number.
17    Q    At 309 34th Place, Northeast, who lives with
18  you?
19    A    **Me, my three kids.**
20    Q    And what are the ages of your children?
21    A    **8, 6 and 3.**
22    Q    Do you have any other children?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

13

1    A    **No.**
2    Q    While you were living at 1732 Capitol Avenue,
3    Northeast, how many children were living with you?
4    A    **3.**
5    Q    And as of June 7 of 2004, what were their
6    ages?
7    A    **I can't remember.**
8    Q    You can't remember their ages?
9    A    **Not at this time.**
10   Q    What is your educational background?
11   A    **I don't understand the question.**
12   Q    Did you go to high school?
13   A    **No.**
14   Q    Do you have a GED?
15   A    **No.**
16   Q    Did you take any kind of special vocational
17   training programs?  Computers, mechanical work,
18   electronics, any beauty type, haircutting, hairdressing,
19   any kind of programs like that?
20   A    **Yes.**
21   Q    Give me the most recent vocational
22   educational program you've ever been involved in.

14

1    A    **VMT --**
2    Q    I'm sorry.  What is it?
3    A    **V, as in Victor, M, as in Mike, T, as in Tom,**
4    **VMT Nursing Academy.**
5    Q    Where is that located?
6    A    **I can't remember the address, but it's**
7    **Connecticut Avenue, Northwest.**
8    Q    And what were you studying there?
9    A    **CNA, Certified Nursing Assistant.**
10   Q    Did you receive any kind of certification?
11   A    **Yes.**
12   Q    What is that certification called?  Does it
13   have a particular name?
14   A    **It's a certificate.**
15   Q    How long did you study to be a Certified
16   Nursing Assistant?
17   A    **Three weeks.**
18   Q    And when did you receive your certification?
19   A    **In July.**
20   Q    Of what year?
21   A    **I can't remember.**
22   Q    Was it last July or the summer before that,

15

1    the summer before that, if you can recall?
2    A    **2006.**
3    Q    So, it was last summer?
4    A    **Yes.**
5    Q    And have you had any other kind of training,
6    vocational training, other than the VMT Nursing Academy?
7    A    **Yes.**
8    Q    Where was that?
9    A    **International School of Home Health Aid**
10   **Academy.**
11   Q    Where is that located?
12   A    **1818 New York Avenue, Northeast.**
13   Q    And did you receive any type of certificate
14   from there?
15   A    **Yes.**
16   Q    What's that certificate called?
17   A    **PCA certificate.**
18   Q    I'm sorry, P --
19   A    **PCA, personal care aide.**
20   Q    Certificate?
21   A    **Yes, and a skills checklist.**
22   Q    Those are two different certificates or are

16

1    they combined into one?
2    A    **It's one certificate and the other is a**
3    **skills checklist telling you what I learned how to do in**
4    **school, what I can do for the patient and what I have**
5    **learned in my training.**
6    Q    The skills checklist was both through the
7    International School of Home Health Academy?
8    A    **Yes.**
9    Q    And when did you attend that academy?
10   A    **I can't remember the exact month, but it was**
11   **in 2006.**
12   Q    And that's also when you received your
13   certificate?
14   A    **Yes.**
15   Q    Do you recall if you received your
16   certificate from the International School of Home Health
17   Academy before or after the certificate that you
18   received from VMT?
19   A    **After.**
20   Q    So, you would have received the PCA
21   certificate sometime after July of 2006, is that fair?
22   Or I should say, is that correct?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

17

1     A    Yes.
2     Q    Let me jump ahead to June 4 of 2004 and, just
3  for the record --
4        MS. RUCKER:  You said June 4 or 7 that you're
5  jumping ahead?
6        MR. JACKSON:  I just want to clarify.
7        MS. RUCKER:  I know.
8        MR. JACKSON:  When I was reading the
9  complaint, it said June 7, but then I was recalling that
10  my first appearance in the court, somebody filled in for
11  you and we stipulated on the record that the correct
12  date would have been June 4, I believe.
13        Let me just go off the record for a minute,
14  please.
15        (A discussion was held off the record.)
16     Q    Turning your attention to June 7, 2004, at
17  approximately 10 o'clock in the evening, do you recall
18  an incident in which there was an altercation of some
19  sort between you and a neighbor?  Do you recall that?
20     A    Yes.
21     Q    How did this incident occur?
22     A    Me and Denise Robertson and another neighbor

18

1  of ours that live next door to me was sitting on the
2  porch.  We got into an argument or a disagreement.
3  Denise was using verbal language and she was yelling and
4  screaming.
5     Q    At you?
6     A    Yes.
7     Q    How long have you known Denise?  How long did
8  you know her as of that day?
9     A    I can't remember.
10     Q    Did she live in the same building that you
11  lived in?
12     A    Yes.
13     Q    And on June 7 of 2004, where were you living?
14     A    1723 Capitol Avenue, Northeast, Apartment 3.
15     Q    The particular incident that has caused you
16  to file this complaint, did it occur in front of 1732
17  Capitol Avenue, Northeast?
18     A    No.
19     Q    Where did it occur?
20     A    1723 Capitol Avenue, Northeast.
21     Q    And that would have been the front of the
22  building you lived in, correct?

19

1     A    Yes.
2     Q    How many apartments are in that building?
3     A    4.
4     Q    And you were in apartment number 3?
5     A    Yes.
6     Q    And where did Denise live, what apartment
7  number?
8     A    I don't remember her apartment number, but
9  downstairs.
10     Q    So, you were on the third floor and she was
11  on the first floor, is that it?
12     A    No.
13     Q    On the second floor, she was on the first
14  floor?
15     A    Yes.
16     Q    Are there two apartments on each floor?
17     A    Yes.
18     Q    As of June 7 of 2004, did you consider
19  yourself to be friends with Denise?
20     A    No.
21     Q    Just neighbors?
22     A    Yes.

20

1     Q    Did she ever baby-sit for you?
2     A    No.
3     Q    Did she have children?
4     A    Yes.
5     Q    Did your children and her children play
6  together?
7     A    No.
8     Q    When you were sitting on the porch, who else
9  was on that porch with you?
10     A    Denise Robertson, Althea Hubbard and myself.
11     Q    Where were your children?
12     A    Outside with me.
13     Q    Where were they in relation to you sitting on
14  the porch?
15     A    Right in front of me, in the yard.
16     Q    Is there a gate that encloses the apartment
17  building?
18     A    At the time, there was no gate.
19     Q    Is there a grassy area in front of the
20  apartment building?
21     A    Yes.
22     Q    Were your children on the porch or off the

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

21

1  porch?
2     A    **Off the porch, in the grass.**
3     Q    In the grass?
4     A    **Yes.**
5     Q    And you indicated that you don't recall the
6  ages of your children at the time of the June 7, 2004
7  incident, correct?  But you told me that their current
8  ages are 8, 6 and 3.  Given the fact this is now almost,
9  within a couple of months, June of 2007, is it fair to
10  say that your 3 year old would have been under the age
11  of 1?
12     A    **Yes.**
13     Q    And so where was the baby on the evening of
14  June 7, 2004?
15     A    **In my arms.**
16     Q    And then your 6 year old would have been
17  approximately somewhere between 2 and 3, is that fair?
18     A    **I can't remember.**
19     Q    But if we take 2007 and, basically, do some
20  subtraction, is it fair to say that your 6 year old at
21  that time would have been somewhere between the age of 2
22  and 3?

22

1        MS. RUCKER:  Objection, asked and answered.
2        You can answer.
3     A    **He would have been 3.**
4     Q    And where was the 3 year old?  And, again,
5  when I say 3 year old this time, I'm actually talking
6  about your 6 year old.  He would have been 3 at the
7  time.  So, have I confused you?
8     A    **No.**
9     Q    Where was he or she?
10     A    **In the yard, playing.**
11     Q    And the 8 year old, where would that
12  individual have been?
13     A    **In the yard, playing.**
14     Q    So, the only child that was in your arms was
15  the baby?
16     A    **Yes.**
17     Q    Now, prior to this particular incident, had
18  you and Denise had fights before?
19        MS. RUCKER:  Objection as to the form.
20        You can answer.
21     A    **I don't recall.**
22     Q    You don't recall?  Did you ever have an

23

1  argument with her before?
2     A    **I don't recall.**
3     Q    The June 7, 2004 incident, what started that
4  between you and Denise?
5     A    **I can't remember.**
6     Q    Did she call you some kind of name that you
7  guys were fighting about?
8     A    **I can't remember that.**
9        MS. RUCKER:  Objection.
10        You have to give me a chance to object.
11        Objection as to the form of the question.
12        You can answer.
13     Q    You don't know what started the argument
14  between yourself and Denise?
15        MS. RUCKER:  Objection, asked and answered.
16        You can answer.
17     A    **I can't remember.**
18     Q    Did the incident with you and Denise turn
19  from a verbal altercation to a more physical
20  altercation?
21        MS. RUCKER:  Objection as to form.
22        You can answer.

24

1     A    **No.**
2     Q    Were you arguing with Denise or was she
3  arguing with you?
4     A    **I ignored her.**
5     Q    What were the things that she was saying to
6  you?
7     A    **I can't remember.**
8     Q    Was she swearing?
9     A    **I can't remember at this time.**
10     Q    Did she say anything about your children?
11     A    **I can't remember.**
12     Q    Anything about your family?
13        MS. RUCKER:  Objection, asked and answered.
14        You can answer.
15     Q    Anything about your extended family?
16     A    **I can't remember.**
17     Q    At some point did you and Denise move from
18  the porch onto the sidewalk?
19     A    **Yes.**
20     Q    And at this point in time were you and Denise
21  still having an argument?
22     A    **She pulled a knife on me and I went towards**

6 (Pages 21 to 24)

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

25

1  the stop sign.
2    Q    Where was your baby at, the baby that you
3  were holding in your arms?
4    A    My neighbor, Althea, took her from out of my
5  arms and took my kids into my house.
6    Q    And what is Althea's last name?
7    A    Hubbard.
8    Q    She a friend of yours?
9    A    No, a neighbor.
10   Q    And once Ms. Hubbard took your child from
11 you, what happened next?
12   A    Denise came closer to me, in my face.  She
13 still was saying all types of things.  I can't remember
14 what she was saying.  Then she pulled a knife out of her
15 pocket or whatever, but she pulled a knife and I ran.
16   Q    Before she pulled a knife, how close did she
17 get to you?
18   A    I can't remember how close she was.
19   Q    Was she close enough that if you reached your
20 arm out, you could touch her?
21   A    I can't remember that.
22   Q    As you and I sit here across this table, it

26

1  looks to be about five and a half feet or so, was she as
2  close as you and I are today?
3    A    I can't recall.
4    Q    Do you know if she was further away than you
5  and I are today?
6    A    I can't remember.
7    Q    Do you know if she was closer than you and I
8  are today?
9         MR. JACKSON:  Objection, asked and answered.
10 You can answer.
11   A    I can't remember how far or how close she
12 was, it happened too fast.
13   Q    When Denise pulled a knife, what did you do?
14        MR. JACKSON:  Objection, asked and answered.
15   A    I ran.
16   Q    And this would have been after Ms. Hubbard
17 had taken your child from you?
18        MS. RUCKER:  Objection, asked and answer.
19 You can answer.
20   A    Yes.
21   Q    Now, when you say you ran, I believe earlier
22 you said you ran towards the stop sign, correct?

27

1    A    Yes.
2    Q    If I am standing in front of your apartment
3  building, facing the building, is the stop sign to my
4  right or to my left?
5    A    Left.
6    Q    And what is the intersecting street where
7  that stop sign would have been located?
8    A    Capitol Avenue.
9    Q    And what is the cross street?  What crosses
10 Capitol Avenue?  What's the name of that street?
11   A    I can't recall at this time.
12   Q    How long did you live at 1723 Capitol Avenue?
13   A    I remember the year, a year, but I'm not for
14 sure how many months after that.
15   Q    But you lived there for at least a year?
16   A    Yes.
17   Q    Have you had the opportunity to review any of
18 the reports that have been produced to your attorney by
19 the District of Columbia, such as the Office of Police
20 Complaints report, the statements, the statements of
21 Officer Wallace, the statements of Lieutenant Houser, as
22 you had known her at that time, Lieutenant Ida George,

28

1  have you had an opportunity to review that?
2    A    No.
3    Q    Are you aware that in these reports it has
4  the location of the fight at 1732 Capitol Avenue?  Are
5  you aware of that?
6    A    I don't understand your question.
7    Q    Well, let me ask you this.  You say that you
8  lived at 1723.  My reports have here that the fight
9  occurred near 1732 Capitol Avenue.  All I want to know,
10 is that a misstatement or are these two different
11 apartment buildings?
12        MS. RUCKER:  Objection as to the form of the
13 question.
14        You can answer.
15   A    Two different locations.
16   Q    How far from 1723 Capitol Avenue would 1732
17 Capitol Avenue be?
18   A    Across the street.
19   Q    Directly across the street?
20   A    Yes.
21   Q    Now, how many houses or apartment buildings
22 would be in between the stop sign and 1723 Capitol

7 (Pages 25 to 28)

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

29

1    Avenue, where you lived?
2    **A    I can't remember.**
3    Q    Do you recall how far you would have to walk
4    to get to that intersection where the stop sign is?
5    **A    I can't recall.**
6    Q    Well, if you walked from your house to the
7    stop sign, how long would it take you?
8    **A    I don't recall.**
9    Q    Would it take you 30 seconds?
10    MS. RUCKER:  Objection, asked and answered.
11    **A    I don't recall.**
12    Q    Do you know if it would take you a minute?
13    MS. RUCKER:  Objection, asked and answered.
14    **A    I don't recall.**
15    MS. RUCKER:  Keep your voice up.
16    Q    When you ran towards the stop sign, did
17    Denise chase you?
18    **A    Yes.**
19    Q    And how many people, if you can recall, were
20    out either on the sidewalk or on the porches at this
21    time, do you recall?
22    **A    I can't remember.**

30

1    Q    Do you know if there were a lot of people?
2    **A    I can't remember.**
3    Q    So, other than run, did you do or say
4    anything else?
5    MS. RUCKER:  Objection as to form.
6    You can answer.
7    **A    No.**
8    Q    So, when Denise pulled the knife, did you say
9    anything to her?
10    **A    I can't remember.**
11    Q    Did you say anything to Ms. Hubbard?
12    **A    I can't remember.**
13    Q    And, I'm sorry, but did you say that there
14    was somebody else on the porch besides yourself,
15    Ms. Hubbard and Denise and your children, of course?
16    **A    No.**
17    Q    Was your sister there?
18    MS. RUCKER:  Objection as to form.
19    **A    Can you ask me the question again.**
20    Q    Do you have any sisters and brothers?
21    **A    Yes.**
22    Q    Were any of your sisters and brothers there

31

1    at this time?
2    MS. RUCKER:  Objection as to form.  What time
3    are you referring to, counsel?
4    Q    Just for the record, when I say "this time,"
5    I'm talking about June 7, 2004, at 10 o'clock.  If I say
6    "this incident," I'm talking about the incident which
7    you have alleged in your complaint.
8    MS. RUCKER:  You just were talking about
9    something on the porch and then you asked was her sister
10    there.  Are you talking about at the time on the porch
11    or at any point that night?
12    Q    Let me back up.  At the time that you were on
13    the porch, was your sister on the porch?
14    **A    No.**
15    Q    When you reached the sidewalk, was your
16    sister there?
17    **A    No.**
18    Q    When Denise pulled a knife on you, was your
19    sister either on the porch or the sidewalk?
20    **A    No.**
21    Q    When you ran to the stop sign, was your
22    sister in that area?

32

1    **A    No.**
2    Q    Were there any family members in that area at
3    that time?
4    **A    No.**
5    Q    Other than, obviously, your children,
6    correct?
7    MS. RUCKER:  Objection, counsel.  That
8    mischaracterizes her testimony.
9    Q    When you moved from the porch to the
10    sidewalk, and were you on the sidewalk or in the street?
11    MS. RUCKER:  Objection as to form.  At what
12    point, counsel?
13    Q    I just said, when you moved from the porch,
14    did you move onto the sidewalk or onto the street?
15    MS. RUCKER:  Objection as to form.  Her
16    testimony was she ran.  That's why I'm confused when you
17    say "move."
18    MR. JACKSON:  She said that she was on the
19    porch and then they were on the sidewalk and when she
20    pulled a knife, she ran.
21    Q    My question is, when you walked from the
22    porch --

8 (Pages 29 to 32)

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

33

1  A  I didn't say that.
2  MS. RUCKER: It's okay. Let him finish his
3  question.
4  Q  When you went from the porch, I thought you
5  said that you were then standing on the sidewalk and she
6  continued to say things to you and then she pulled a
7  knife.
8  A  I said, when we was on the porch, she pulled
9  a knife. I ran towards the stop sign.
10  Q  When you were on the porch, she pulls a
11  knife, you run from the porch, you ran on the
12  sidewalk --
13  MS. RUCKER: Objection as to the form of the
14  question.
15  Q  -- is that correct?
16  A  Yes, I was on the sidewalk.
17  Q  And my question was, at any time did you run
18  into the street?
19  A  No.
20  Q  When you ran from the porch, where were your
21  two oldest children?
22  MR. JACKSON: Objection, asked and answered.

34

1  You can answer.
2  A  A neighbor, Althea, took my kids upstairs
3  before I ran.
4  Q  Did Ms. Hubbard take the kids upstairs before
5  Denise pulled the knife on you?
6  A  Yes.
7  Q  Did you challenge Denise to a fight?
8  MS. RUCKER: Objection as to form.
9  You can answer.
10  A  I don't recall.
11  Q  Did you tell Denise that you would fight her?
12  MS. RUCKER: Objection.
13  A  I don't recall.
14  MS. RUCKER: Objection, asked and answered.
15  You can answer.
16  Q  I'm sorry, what was your answer?
17  A  I don't recall.
18  Q  When you ran to the stop sign, do you know if
19  Denise followed you?
20  A  Yes.
21  MS. RUCKER: Objection, asked and answered.
22  You can answer.

35

1  A  Yes.
2  Q  Did she run after you?
3  A  Yes.
4  Q  Did she catch up with you?
5  A  I don't recall.
6  Q  Did you make it to the stop sign?
7  A  Yes.
8  Q  When you got to that stop sign, what did you
9  do?
10  A  I stopped.
11  Q  And did you turn around and face the
12  direction that you just ran from?
13  A  First I looked, looked back. Her boyfriend
14  and her was walking towards, back towards the building.
15  Q  Did you see Denise with the knife in her hand
16  at that point?
17  A  Yes, she still had the knife in her hand.
18  Q  And what did you observe them doing once they
19  walked back towards the apartment?
20  A  Denise's boyfriend was calming her down,
21  talking to her. That's when I began to walk back.
22  Q  And as you're walking back, what happened

36

1  next?
2  A  As I'm walking back towards the buildings,
3  she comes towards me again with the knife.
4  Q  Did she walk towards you or did she run
5  towards you?
6  A  I can't remember.
7  Q  Where was her boyfriend at?
8  A  He was standing a little bit behind her.
9  Q  Was he still trying to hold her back, do you
10  know, or do you recall?
11  A  Not that I recall.
12  Q  And as she walked toward you, what did you
13  do?
14  MS. RUCKER: Objection, mischaracterizes the
15  testimony. You asked the witness did she recall whether
16  she walked around and she said she didn't recall.
17  Q  As she came towards you, what did you do?
18  A  I stood there.
19  Q  And what did Denise do?
20  A  She pointed the knife back and forth in my
21  face.
22  Q  And how close was she at this time that she's

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

37

1   pointing the knife back and forth in your face, how
2   close is she to you?
3       A   **Close.**
4       Q   How close?
5       A   **I can't remember how close.**
6       Q   And, again, as you and I sit here today, was
7   she as close as you and I are now?
8       A   **Closer.**
9       Q   Was she halfway between the distance that you
10  and I are right now?
11      MS. RUCKER: Objection.
12      You can answer.
13      Q   And, again, I've estimated this to be about
14  five, five and a half feet between where you're sitting
15  and I'm sitting.
16      MS. RUCKER: Same objection.
17      You can answer.
18      A   **I wouldn't be able to guess that, but she was**
19  **close.**
20      Q   And did she say anything to you as she has
21  this knife?
22      A   **Yes.**

38

1       Q   What is she saying?
2       A   **I can't remember what she was saying, but she**
3   **was cursing and she was saying everything. I just can't**
4   **recall exact words at this time.**
5       Q   What, if anything, did you say?
6       A   **I can't remember.**
7       Q   Did you have anything in your hands?
8       A   **No.**
9       Q   Other than the knife that Denise had, did she
10  have anything else in her hands?
11      A   **No.**
12      Q   So, after she's coming towards you and she's
13  waving this knife back and forth in your face, what
14  happened next?
15      A   **Officer Wallace -- is that his name --**
16      Q   I'll stipulate for the record that's his
17  name, yes.
18      A   **-- pulled onto the street in his police**
19  **cruiser.**
20      Q   Now, you were some distance between where you
21  lived and the stop sign is, correct?
22      MS. RUCKER: Objection as to the form of the

39

1   question.
2       Q   Is 1723 located at the corner where the stop
3   sign is?
4       A   **No.**
5       Q   You've indicated that Officer Wallace pulled
6   onto the one-way street. Is 1730, that block, is that a
7   one-way street?
8       MS. RUCKER: Objection. Counsel, you're
9   saying 1730?
10      Q   Let me rephrase it.
11      The block that you lived on, that's a one-way
12  street?
13      A   **Yes.**
14      Q   And so did Officer Wallace drive from behind
15  you or was he coming towards you when you first noticed
16  him?
17      A   **Behind.**
18      Q   At that point, were there other people in the
19  street or on the street?
20      A   **Yes.**
21      Q   And let me, just for the record, because I
22  know sometimes I hear people use "street" and "sidewalk"

40

1   interchangeably; when I say "street," I'm talking about
2   the area where cars drive, and if I say "sidewalk," I'm
3   talking about where people generally walk. Is that
4   fair?
5       A   **Yes.**
6       Q   Do you know if people were both in the street
7   and on the sidewalk?
8       MS. RUCKER: At what point, counsel?
9       MR. JACKSON: We're at a point now, I'm
10  trying to go chronological, but she said Officer Wallace
11  pulled up.
12      MS. RUCKER: That's what I wanted to know.
13  Go ahead.
14      A   **Can you ask me the question again.**
15      Q   Right.
16      At the point that you noticed Officer
17  Wallace, I believe you said that there were other people
18  out on the street. Is that correct?
19      A   **They were in the street.**
20      Q   So, you're talking about in the street where
21  the cars would generally drive when you say "street,"
22  correct?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

41

1    A    Yes.
2    Q    Were there also individuals on the sidewalk?
3    A    There were some people in the street. I
4    can't remember exactly where everyone was at. I can't
5    remember that.
6    Q    I'm not asking you to tell me exactly where a
7    particular individual was, but, just generally, were
8    people on the sidewalk and in the street or just in the
9    street?
10   A    I can't remember.
11   Q    Approximately how many people were out there?
12   A    I don't -- I don't recall that. I don't
13   recall how many was there at the time.
14   Q    Do you recall what the people in the street
15   were doing?
16   A    They were standing there.
17   Q    Do you recall if they were saying anything?
18   A    No, I can't recall.
19   Q    Let me make sure I'm clear, or maybe I need
20   to ask the question more clearer, and I'm not at this
21   point asking you what was said or what the words were,
22   but do you recall hearing voices coming from the crowd?

42

1    A    No.
2    Q    Do you recall whether or not you heard
3    anybody cursing or swearing?
4         MS. RUCKER: Objection, asked and answered.
5         You can answer.
6    A    No, I can't recall that.
7    Q    What about the individuals you might recall
8    who were on the sidewalk, do you recall hearing any
9    voices coming from the people on the sidewalk?
10        MS. RUCKER: Objection, mischaracterizes the
11   testimony. The witness indicated she didn't recall if
12   people were on the sidewalk.
13   Q    Do you recall hearing any voices coming from
14   the sidewalk?
15        MS. RUCKER: Objection.
16        You can answer.
17   A    No, I don't recall.
18   Q    So, once you noticed Officer Wallace, what
19   happened next?
20   A    Denise started to walk away and Officer
21   Wallace, he exited his patrol car.
22   Q    And did you say anything to Officer Wallace?

43

1    A    The people in the street told him Denise had
2    a knife.
3    Q    Do you know who in the street said that?
4    A    The crowd. The crowd that was standing
5    there.
6    Q    And how large was this crowd?
7    A    I don't remember.
8    Q    Do you recall how many times you heard
9    anybody say that Denise had a knife?
10   A    They kept telling him. They kept telling
11   Officer Wallace that she had a knife over and over.
12   Q    Did you say anything to Officer Wallace?
13        MS. RUCKER: Objection as to form.
14        You can answer.
15   A    I didn't get a chance to.
16   Q    Do you recall, when the crowd was saying,
17   "She has a knife," do you recall them pointing to
18   anybody in particular?
19   A    Yes.
20   Q    Who did they point to?
21   A    Denise Robertson.
22   Q    Where was Denise at this point?

44

1    A    She was almost at the building before. When
2    they told Officer Wallace she had a knife, she was
3    almost at the porch part of our building where we left.
4    Q    At 1723 Capitol Avenue?
5    A    Yes.
6    Q    Did she still have the knife in her hand?
7    A    I can't remember. I can't remember if she
8    still had the knife because at that time Officer Wallace
9    then grabbed me, clipped me and pushed me forward to the
10   ground. So, I couldn't -- I wasn't paying attention to
11   what she had at the time.
12   Q    Prior to Officer Wallace clipping you and
13   pushing you to the ground, did he say anything to you?
14   A    No.
15   Q    From what you recall, Officer Wallace turned
16   onto the one-way street. At some point you realized he
17   was there, is that correct?
18        MS. RUCKER: Objection, asked and answered.
19        You can answer.
20   A    Yes.
21   Q    And did you see him get out of his cruiser?
22   A    Yes.

11 (Pages 41 to 44)

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

53

1    What about the word "disruptive?"

2    **A    I would need a definition.**

3    Q    Were you at all resisting Officer Wallace's

4    attempts to put you to the ground?

5    **A    No.**

6    Q    If I may, can you tell me how much force he

7    used to force you to the ground?

8    **A    I don't understand what you mean by how much**

9    **force.**

10    Q    Well, let me ask you this way.  Did he take

11    his arm and swing it and strike you with such force that

12    it caused you to fall to the ground?

13    **A    No.**

14    Q    Did he grab you by the hair and push your

15    head down with such force that it caused you to go to

16    the ground?

17    **A    Did he pull my hair or push it?**

18    Q    Well, pull you by the hair.

19    **A    No.**

20    Q    Did he in any way take his knee and kick the

21    back of your knees to force you to the ground?

22    **A    No.**

54

1    Q    Did he take his nightstick off his ASP and

2    strike you with it to force you to the ground?

3    **A    No.**

4    Q    Did he put his hand on your back and force

5    you to the ground?

6    **A    No.**

7    Q    Did he grab you by the shoulders as he's

8    kicking your feet out from you to force you to the

9    ground?

10    **A    No.**

11    Q    Did he hit you with his shoulder or his

12    forearm to force you to the ground?

13    **A    No.**

14    Q    How did he force you to the ground?

15    **A    He clipped my legs in the front and he pushed**

16    **me forward to the ground, face first.**

17    Q    Maybe my question wasn't clear.  When you say

18    he pushed you, did he push you with his hand?

19    **A    Yes.**

20    Q    And where was his hand?

21    **A    In the back of my head.**

22    Q    In the back of your head.  Okay.

55

1    How much force did he use to do that?

2    **A    I wouldn't know.**

3    Q    Did it cause your neck to hurt at all?

4    **A    My hand was scraped, my knee was scraped, my**

5    **knee was bleeding.**

6    Q    What about your neck?

7    **A    No.**

8    Q    So, now, after you're on the ground, and I

9    believe you said you turned around to ask what's going

10    on and were you asking Officer Wallace what's going on?

11    **A    Yes.**

12    Q    At this point were you handcuffed?

13    **A    No.**

14    Q    What did Officer Wallace say to you?

15    **A    I can't remember.**

16    Q    Did he say anything to you?

17    **A    I can't remember, if he did, what was his**

18    **exact words, I can't remember.**

19    Q    Is there anything that I could show you that

20    might help refresh your recollection?

21    **A    Show me about what?**

22    Q    Anything that I could show you that would

56

1    help you to remember what might have occurred between

2    you and Officer Wallace.

3        MS. RUCKER:  I'm going to object, counsel.

4    That's an improper refreshing of recollection attempt

5    with respect to the witness, but you can add to the

6    question.

7    **A    I don't understand what you're talking about.**

8    Q    What is the next thing you recall, the next

9    event you recall happening after you're on the ground?

10    You turn around to ask Officer Wallace what's going on,

11    what is the next event that you recall happening?

12    **A    I tried to get up, to stand up and he reached**

13    **for his stick.**

14    Q    How big was his stick?

15    **A    I can't remember how big it was.**

16    Q    Do you know if it was 6 inches, 8 inches?

17        MS. RUCKER:  Objection.

18        You can answer.

19    **A    I can't remember.**

20    Q    How do you know he was reaching for his

21    stick?

22    **A    He had something on the side of him that was**

14 (Pages 53 to 56)

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

57

1  long and black.
2      Q     Long and what, I'm sorry?
3      A     **Long and black. It was a hard object and I**
4  **just don't know how big it was.**
5      Q     You said on the side. Was he holding it in
6  his hand or was it on his waist somehow?
7      A     **It was on his waist somewhere.**
8      Q     Did he ever take this off his waist?
9      A     **I can't recall if he did.**
10     Q     When you first observed him reaching for this
11 stick, was his hand off of the stick, away from the
12 stick?
13         MS. RUCKER: Objection as to form.
14     A     **He was reaching for the stick as if he was**
15 **about to touch it.**
16     Q     But he did not touch it at that point, when
17 you first noticed it?
18         MS. RUCKER: Objection as to form.
19         You can answer.
20     A     **I don't understand what you're saying.**
21     Q     You said that he was reaching as if to touch
22 it. My question is, when you observed Officer Wallace

58

1  reaching as if to touch it, at that point his hand had
2  not actually touched the stick, correct?
3         MR. JACKSON: Objection as to form.
4      A     **No.**
5      Q     No, his hand had not touched it?
6         MS. RUCKER: Same objection as to form.
7         You can answer.
8      A     **I can't remember if he touched it or not.**
9      Q     And then what happened next?
10     A     **As he was reaching for his stick, the crowd**
11 **told me to stay down, "Stay down. Don't move."**
12     Q     At this point in time, other than your
13 children who were in the apartment, were any of your
14 family members there?
15     A     **No.**
16     Q     And as the crowd told you to stay down, stay
17 down, what did you do?
18     A     **I stayed down.**
19     Q     What did Officer Wallace do?
20     A     **He then grabbed me, lifted me up, put the**
21 **handcuffs on me.**
22     Q     How did he grab you?

59

1      A     **I can't remember exactly how he grabbed me.**
2      Q     Do you remember if he grabbed you by the
3  shoulders, around your waist, under your armpits, do you
4  recall that?
5      A     **I can't remember.**
6      Q     Do you recall if he grabbed you by one hand
7  or two hands?
8      A     **I can't remember.**
9      Q     When you say he picked you up, can you tell
10 me whether or not at any time did your feet come off the
11 ground?
12     A     **No, they did not.**
13     Q     As he picked you up, what did he say to you?
14     A     **That I was going to jail and my kids was**
15 **going to child and family services.**
16     Q     And did you say anything to him?
17     A     **I kept repeating that Denise had a knife and**
18 **she was standing there and I also pointed her out.**
19     Q     And was she still on the porch at that point?
20     A     **Yes.**
21     Q     And could you see whether or not she still
22 had a knife in her hand?

60

1      A     **No, she didn't have a knife at that time.**
2      Q     When Officer Wallace said to you, "You're
3  going to jail," did you ask him why?
4      A     **Well, as soon as he told me I was going to**
5  **jail, that's when I started to cry.**
6      Q     My question is, did you ask him why you were
7  going to jail?
8      A     **I can't remember.**
9      Q     Now, before you say he put you in handcuffs,
10 let me back up a couple of frames. When he picked you
11 up, were you then facing him or was he behind you?
12     A     **He was behind me.**
13     Q     And he told you you were going to jail, is
14 that what you're saying?
15         MS. RUCKER: Objection, asked and answered.
16         You can answer.
17     A     **Yes.**
18     Q     Then it's my understanding from your
19 testimony he then put the handcuffs on you, correct?
20         MS. RUCKER: Objection, mischaracterizes the
21 sequence of the testimony.
22         You can answer.

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

69

1  just asked you to read it over for us and let me know
2  when you're ready and then I'll ask you a question.
3      A   I'm ready.
4      Q   There's also, I believe, it goes over to the
5  next page, so I want to make sure that you read the
6  whole thing.
7      A   Oh.
8      Q   Okay? And, in fact, I think it even goes
9  over to the next page.
10     MS. RUCKER: Read all of the answer for
11  number 7 that's in bold. Do you see where it starts in
12  bold, where it says "answer?" Read all the bold.
13     THE WITNESS: You want me to read it out
14  loud?
15     MS. RUCKER: No, you can read it to yourself.
16     MR. JACKSON: I can actually speed this up a
17  bit.
18     MS. RUCKER: Okay.
19     Q   Let me just ask you and then you can take a
20  look through your statement, but do you see anywhere in
21  answer to number 7 where you say that the handcuffs were
22  put on too tightly?

70

1      A   At that time I didn't remember every exact
2  thing. Like I just gave them mainly -- I remember when
3  I told them about the handcuffs. I see it, it's right
4  there.
5      Q   But my question is, do you see where it says
6  that they put the handcuffs on too tightly?
7      A   No, it isn't there.
8      Q   And when you were interviewed or gave a
9  statement to the Office of Police Complaints
10  investigator, do you recall whether or not you told that
11  person that the handcuffs were on too tightly?
12     MS. RUCKER: Objection. I just want to point
13  out an objection to a point of information for the
14  record. The witness's pointing out the fact that it
15  doesn't say that the handcuffs were on too tight. You
16  didn't have any question related to that and then my
17  objection to this particular question that you presently
18  have pending is as to form.
19     You can answer.
20     A   I remember that I told Officer Wallace at the
21  time he put the handcuffs on me, but I don't remember
22  that I told the Office of Police Complaints.

71

1      Q   I'm showing you now exhibit number 4 from
2  Lieutenant Houser's deposition and this is the Office of
3  Police Complaints MPD radio run tape transcript, tape
4  number 04-0273. That's the document. I will show you
5  that.
6      By the way, Ms. Cotton, have you had the
7  opportunity to listen to the 911 or 311 calls that you
8  placed to the Metropolitan Police Department?
9      A   I didn't hear everything you said.
10     Q   Have you had the opportunity to listen to the
11  tape recordings from 911 or 311 that you placed to the
12  Metropolitan Police Department?
13     A   No, I have not.
14     Q   Let me ask you, do you see the section where
15  it says "tape 2/side A" at the very top?
16     A   Yes.
17     Q   And right below that it says "Cotton," do you
18  see that?
19     A   Yes.
20     Q   And it says "Cotton" and then it says, "I
21  slammed you because you swung on me." Do you see that?
22     A   Yes.

72

1      Q   Do you know who you were referring to when
2  you said, "I slammed you because you swung on me"?
3      A   I can't remember.
4      Q   Did you slam Denise?
5      A   No.
6      Q   Now, I believe that we had reached the point
7  in this event of June 7 of 2004 when Officer Wallace had
8  put the handcuffs on you. Okay? So, picking up from
9  that point on, once he put the handcuffs on you, did he
10  say anything to you?
11     A   Yes.
12     Q   What did he say?
13     A   I was going to jail and my kids was going to
14  child and family services.
15     Q   Did you tell Officer Wallace that you had
16  children?
17     A   No.
18     Q   Do you know whether or not at that point
19  Officer Wallace knew that you had children?
20     A   Yes.
21     Q   Do you know how Officer Wallace knew you had
22  children?

18 (Pages 69 to 72)

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

73

1     A     Yes.
2     Q     How did he know?
3     A     Because he asked Denise and other people that
4     was standing on the porch with her were those my kids
5     upstairs.
6     Q     So, Denise was on the porch at this point?
7     A     Yes.
8     Q     So, Officer Wallace had a conversation with
9     Denise?
10    A     Yes.
11    Q     And when he had that conversation with
12    Denise, did you tell Officer Wallace that she's the one
13    that had the knife?
14    A     I told him several times; he ignored me.
15    Q     I understand that. My question was, when he
16    asked Denise whose kids were those upstairs, did you
17    tell Office Wallace that Denise was the one that had the
18    knife?
19    A     Yes.
20    Q     Now, do you know how Officer Wallace knew
21    that there were kids upstairs?
22    A     My kids was in the window crying.

74

1     Q     And did you see them in the window?
2     A     Yes.
3     Q     Did you see anybody else in the window?
4     A     Yes.
5     Q     Who did you see in the window?
6     A     Althea Hubbard, my neighbor.
7     Q     How many of your children were in the window
8     crying?
9     A     My 8 year old and my 3 year old.
10    Q     Did you see the baby?
11    A     No.
12    Q     And when Officer Wallace was talking to
13    Denise, did he walk away from you to talk to her?
14    A     I can't remember.
15    Q     At the time that Officer Wallace put the
16    handcuffs on you, how far were you from the porch to
17    your apartment building?
18    A     Excuse me?
19    Q     At the time that Officer Wallace put the
20    handcuffs on you, how far were you from the porch to
21    your apartment building?
22    A     I don't remember.

75

1     Q     Were you still standing on the sidewalk?
2     A     He placed --
3          MS. RUCKER: Objection, misstates the
4     testimony.
5          You can answer.
6     A     When he put the handcuffs on me, he took me
7     to an abandoned building and set me on the porch.
8     Q     Is the abandoned building on the same side of
9     the street as your apartment building was?
10    A     Yes.
11    Q     How far from your apartment building is the
12    abandoned building?
13    A     I don't know.
14    Q     Is it next door to your building?
15    A     I wouldn't be able to tell you because I
16    don't know.
17    Q     You don't know whether or not the abandoned
18    building was right next door to you?
19    A     I can't remember.
20    Q     When did you move from 1723 Capitol Avenue,
21    Northeast?
22    A     I can't remember the exact date.

76

1     Q     How long after the incident of June 7, 2004
2     did you move from 1723 Capitol Avenue, Northeast?
3     A     Can you repeat that?
4     Q     How long after the incident of June 7 did you
5     move?
6     A     July.
7     Q     So, approximately a month later?
8     A     Yes.
9     Q     And I believe you testified earlier it was a
10    little over somewhat of a year that you lived there?
11    A     Yes.
12    Q     And you're now testifying that you don't know
13    if the abandoned building was or was not next door to
14    where you lived?
15         MS. RUCKER: Objection, argumentative.
16    Objection, it's been asked and answered.
17    A     I can't remember how far they were from each
18    other.
19    Q     I'm not asking you the distance. I'm asking
20    you, you lived at 1723 Capitol Avenue, Northeast. The
21    abandoned building that you say Officer Wallace took you
22    to, would that be the next building to either side of

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

77

1  the building you lived in?
2      A   Yes, it was the next building.
3      Q   Now, when you say he took you to the
4  building, what did he do?
5      A   He walked me there when I was -- I had
6  handcuffs behind me.  He walked me to the porch and set
7  me down on the step.
8      Q   And as he's walking you to the porch, did he
9  say anything to you?
10     A   He told me to sit down.
11     Q   Did you say anything to him?
12     A   I then had an anxiety attack.
13     Q   Did you sit down?
14     A   Yes.
15     Q   Did he force you to sit down?
16     A   No.
17     Q   And how long have you been experiencing
18  anxiety attacks?  And maybe I should be a little bit
19  clearer.  Prior to this particular day, how long had you
20  been experiencing anxiety attacks?
21         MS. RUCKER:  Objection as to form.
22         You can answer.

78

1      A   I can't understand what you're asking me.
2      Q   Prior to June 7 of 2004, did you have anxiety
3  attacks?
4      A   Before then?
5      Q   Yes.
6      A   No.
7      Q   That was the first time you had an anxiety
8  attack?
9      A   I was having anxiety way before June 2004,
10  but they was under control.  I wasn't no longer having
11  them.
12     Q   Well, that was my question, I believe.
13         MS. RUCKER:  That was her answer, counsel.
14     Q   When you say way before June of 2004, how
15  much prior to June of 2004 were you having these anxiety
16  attacks?
17     A   I can't remember the actual date and time.
18     Q   Can you remember the month?
19     A   No.
20     Q   The year?
21     A   I can't remember at this time.
22     Q   Now, did you sit on the stairs of the

79

1  abandoned building?
2      A   Yes.
3      Q   Once you sat on the stairs, what happened
4  next?
5      A   Officer Wallace walked away from me and left
6  me there sitting alone.
7      Q   Did you see where he went?
8      A   I can't remember exactly because I was going
9  through anxiety.  I was upset, I was crying, so I can't
10  remember exactly where he walked or what he done.
11     Q   Do you remember whether or not he went to
12  talk to Denise?
13         MS. RUCKER:  Objection, asked and answered.
14         You can answer.
15     A   The only thing I can remember at this time
16  is, a police cruiser pulled up and he went to talk to
17  the officer that arrived on the scene.
18     Q   Well, that's fair enough.  So, that's what
19  you recall his next movement being once you sat on the
20  steps, that he went and talked to a police cruiser --
21         MS. RUCKER:  Objection.
22     Q   -- or he went over to a police cruiser?

80

1         MS. RUCKER:  Objection.  It mischaracterizes
2  the statement.  The witness said all she can remember.
3  Your question insinuates that she's saying that it's a
4  sequence of events.
5      Q   That's not what I'm asking you in terms of
6  the sequence of events.
7         My question was, and I understand your answer
8  when you said you can't remember when I asked you if he
9  went to talk to Denise, you said you can't remember
10  exactly what he did, but your next recollection of an
11  event, I'm not asking you what occurred first, was that
12  he went over to a police cruiser, is that correct?
13     A   I can't understand because you're asking me
14  two different things at one time.
15     Q   After you were sitting on the stairs, you
16  recall Officer Wallace walking away from you, going to a
17  police cruiser, correct?
18         MS. RUCKER:  Objection, mischaracterizes the
19  testimony.  Objection as to form.
20         You can answer.
21     A   I don't recall him walking away, going
22  directly to the police cruiser.  After he left me, I

20 (Pages 77 to 80)

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

85

1    anything?

2    A    At the time of my anxiety attack?

3    Q    Yes, ma'am.  Or Miss, I should say.

4    A    When I was having my anxiety attack, I

5    couldn't even speak.  I was focused on calming myself

6    down.

7    Q    Did you calm down after a while?

8    A    Yes, when my sister arrived.

9    Q    And when your sister arrived, where was

10   Officer Wallace?

11   A    I can't remember.

12   Q    Did he walk back over to you?

13   A    No.

14   Q    You don't remember where he was?

15   A    Not at that time.

16   Q    How long were you in handcuffs?

17   A    A long time.

18   Q    For how long?

19   A    I can't -- I can't give you an estimate of

20   time, but I was in handcuffs a very long time.

21   Q    Do you know if it was more than 15 minutes?

22   A    Yeah, it was more than 15 minutes.

86

1    Q    More than an hour?

2    A    I wouldn't be able to tell you that because

3    at that time I wasn't timing myself, but I was in

4    handcuffs a long time.

5    Q    Did you ever hear Officer Wallace say,

6    "You're under arrest"?

7    A    Yes.

8    Q    What did he say?

9    A    Hold on.  Can you ask me that again.

10   Q    Did you ever hear Officer Wallace say to you

11   that you were under arrest?

12   A    Under arrest --

13   Q    Yes.

14   A    -- or going to jail?

15   Q    No, under arrest.

16   A    No.

17   Q    Now, at some point did Officer Wallace take

18   the handcuffs off you?

19   A    Yes.

20   Q    And what did he say to you as he's taking the

21   handcuffs off you?

22   A    I can't remember exactly what he said, but

87

1    what I can remember was, him and my sister negotiated

2    that if he took the handcuffs off of me, I would have to

3    go with her and leave my house, and she begged him that

4    she will take me with her so that I wouldn't go to jail

5    and my kids wouldn't go to child and family services.

6    Q    Did he take the handcuffs off?

7    A    Yes.

8    Q    And did you leave with your sister?

9    A    I don't understand what you're saying.

10   Q    Well, I thought you just told me that your

11   sister and Officer Wallace negotiated and they said if

12   he takes the handcuffs off you, that you have to leave

13   with your sister?

14   A    Yes, he did, but if you're talking about

15   right away.  Are you talking about did I leave like once

16   he took me out of the handcuffs, did I leave?

17   Q    Yes.

18   A    I can't remember leaving right away.

19   Q    Do you recall going back into your apartment?

20   A    Yes.

21   Q    And when you went back into your apartment,

22   do you know where Officer Wallace was?

88

1    A    He was still outside.

2    Q    Do you know what he was doing?

3    A    As we was walking into the building, Officer

4    Wallace then got in his police car.

5    Q    And what did he do?

6    A    He was writing something down.

7    Q    And you were in your apartment at this point?

8         MS. RUCKER:  At what point?

9    Q    When Officer Wallace is sitting in his car

10   writing something down, you were in your apartment at

11   that point?

12   A    We were going inside my apartment.

13   Q    And when you got into your apartment, did you

14   call 911 or 311?

15   A    Yes.

16   Q    And at some point did Officer Wallace give

17   you a copy of a police report?

18   A    Yes.

19   Q    And did he come into your apartment to give

20   you that report?

21   A    No.

22   Q    How did you get the report from him?

22 (Pages 85 to 88)

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

109

1      MS. RUCKER: Objection, calls for a medical
2  conclusion. So, I want to object as well to the form of
3  the question, but you can answer.
4      A   Can you repeat that because I be forgetting
5  the question.
6      Q   What is it that Officer Wallace did to you
7  that causes you to now have or to have anxiety attacks?
8      MS. RUCKER: Same objection.
9      You can answer.
10     A   On the day that the incident happened, when
11 he told me I was going to jail, I had an anxiety attack
12 because I never been -- well, I -- I was afraid of going
13 to jail. The word I want to say, I don't want to say
14 it, but I hadn't been arrested before then, so I was
15 real scared. I have nightmares about him shooting me
16 with his gun. I have nightmares a lot. I'm on
17 medication -- I was on medication for that and my doctor
18 had to up my doses because it was getting to the point
19 where she couldn't even, you know, help me. I call
20 hotlines for help when I'm having anxiety because my
21 pregnancy, I can't take medication, so the anxiety has
22 really gotten worser ever since Officer Wallace, on that

110

1  day. Every time I'm driving and I see a police car, I
2  get nervous and I have to pull over because of what he
3  did to me. It's a lot of things I can go on with.
4      Q   You said that you had never been arrested
5  before, is that correct?
6      MS. RUCKER: Objection.
7      MR. JACKSON: I'm just following up on a
8  question.
9      MS. RUCKER: I didn't instruct her not to
10 answer, either. You know why I've objected.
11     You can answer.
12     A   I didn't say never. I said, I haven't been
13 arrested before.
14     Q   Well, have you been arrested before?
15     A   No.
16     MS. RUCKER: Objection.
17     Q   Have you ever been convicted of any crimes?
18     MS. RUCKER: Objection.
19     You can answer.
20     A   No.
21     Q   You told me about Officer Wallace at some
22 point on June 7 of 2004 being on the scene, you told me

111

1  about a second officer pulling up in a scout car or a
2  cruiser and Officer Wallace having some words with that
3  individual, and you told me about a third officer who
4  came to your apartment building at some point. Did any
5  other police officers come to talk with you following
6  June 7 of 2004 to talk with you about Denise Robertson?
7      A   No.
8      Q   Do you know whether or not Denise Robertson
9  was arrested as a result of the incident that occurred
10 on June 7 of 2004 between you and Denise?
11     MS. RUCKER: Objection. I will instruct the
12 witness not to answer regarding any discussions that
13 she's had with her counsel.
14     MR. JACKSON: That's fine.
15     MS. RUCKER: If you're asking her outside of
16 any discussions did she have any knowledge, she can
17 answer the question.
18     Q   Do you have any knowledge of her being
19 arrested?
20     A   Yes.
21     MS. RUCKER: Outside of your discussions with
22 counsel.

112

1      A   Yes.
2      Q   What is your understanding or what is the
3  basis of your knowledge as it relates to Robertson's
4  arrest?
5      A   Can I go back and tell you what happened?
6      MS. RUCKER: No, just answer his question.
7  He's asking the basis of your knowledge that she was
8  arrested.
9      Is that your question?
10     A   My knowledge of how she -- how I knew?
11     Q   Yes.
12     A   Because I was the one who called the police
13 to have her arrested.
14     Q   And that would have been when? Which day did
15 you call the police to have her arrested?
16     A   The next day.
17     Q   Did a police officer come out to your house
18 and interview you?
19     A   No.
20     Q   Did you see the police arresting Denise?
21     A   Yes.
22     Q   What time of the day was this?

28 (Pages 109 to 112)

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

113

1    A    I don't know the time of the day, but it was
2    in the afternoon.
3    Q    Did you call either 911 or 311 to ask that
4    Denise be arrested that day?
5    A    Yes.
6    MS. RUCKER:  When you say "that day,"
7    counsel, what day are you referring to?
8    MR. JACKSON:  This would be June 8.
9    MS. RUCKER:  She's saying the next day?
10    MR. JACKSON:  Right.
11    MS. RUCKER:  Okay.
12    Q    That's correct, we're talking about the next
13    day?
14    A    Yes.
15    Q    Did any police officers come and talk to you
16    about this?
17    MS. RUCKER:  Objection, asked and answered.
18    You can answer.
19    A    No.
20    Q    Did you have to do a statement for any police
21    officer as it relates to Denise Robertson's arrest?
22    A    No.

114

1    Q    Did you go to court at all as the victim of
2    being in the altercation with Denise Robertson?
3    MS. RUCKER:  Objection.
4    You can answer.
5    A    No, because I wasn't subpoenaed --
6    MS. RUCKER:  He just said, "Did you go."
7    A    Oh, no.
8    Q    Do you know what Denise Robertson was charged
9    with?
10    MS. RUCKER:  Objection.
11    You can answer.
12    A    No.
13    Q    Do you know what the outcome of the case
14    against Denise Robertson --
15    A    No.
16    Q    -- was?
17    Did you and Denise Robertson have a fight
18    after June 7 of 2004?
19    MS. RUCKER:  Objection.
20    You can answer.
21    A    No.
22    Q    Did you seek to obtain a restraining order or

115

1    an order of protection to prevent Denise Robertson from
2    coming near you or your children?
3    A    I can't remember if I did.
4    Q    Do you remember if you went to court to ask
5    for such an order?
6    MS. RUCKER:  Objection.
7    You can answer.
8    A    No, I don't remember.
9    Q    At the time that you were sitting on the
10    steps of the abandoned building and started to have your
11    anxiety attack, do you recall whether or not Officer
12    Wallace told you to calm down?
13    A    No, I don't remember.
14    MR. JACKSON:  Give me a second, I might be
15    pretty much finished.
16    MS. RUCKER:  Sure.
17    Q    Ms. Cotton, other than any conversations you
18    had with your lawyer, what, if anything, did you do to
19    prepare yourself to come to this deposition and answer
20    my questions?
21    A    I don't understand the question.
22    Q    Other than talking with your lawyer, did you

116

1    talk to anybody about having to come to this deposition?
2    A    No.
3    Q    Did you review any documents, any reports?
4    A    No.
5    Q    Did you listen to any kind of tape recordings
6    of 911 or 311 calls?
7    A    No.
8    Q    Do you know where Denise Robertson lives
9    today?
10    A    No.
11    Q    What about Ms. Hubbard, do you know where
12    Ms. Hubbard lives?
13    A    No.
14    Q    I want to know if you, not what your lawyer
15    has asked anybody, but you, have you asked Ms. Hubbard
16    to testify at this trial for you?
17    A    I don't understand.
18    Q    Have you had a conversation with Ms. Hubbard
19    and asked her that if this case goes to trial, that you
20    would like her to come in and testify on your behalf?
21    A    I don't remember.
22    Q    You don't remember if you've asked her that?

29 (Pages 113 to 116)

DEPOSITION OF LATASHA M. COTTON
CONDUCTED ON WEDNESDAY, APRIL 18, 2007

121

1    A    Yes.
2    Q    At the time that you indicated that you saw
3    him reach for it, did you believe that if you tried to
4    get up, that he would hit you with it?
5    A    Yes.
6        MS. RUCKER:  Counsel, I'm going to ask you,
7    when you were asking Ms. Cotton questions regarding the
8    statement that she gave to the Office of Citizen
9    Complaint Review, was this the document that you were
10   reading from when you were picking various things that
11   you asked Ms. Cotton whether or not she had stated to
12   the investigator?
13       MR. JACKSON:  Yes.  Let me double check.
14   That should be the document I was referring to.
15       MS. RUCKER:  Let me leave it in front of you
16   while you check.
17       MR. JACKSON:  Yes, that's the one.
18       MS. RUCKER:  Okay.
19   Q    Ms. Cotton, I think you testified that you
20   went down to the Office of Citizen Complaint Review,
21   correct?
22   A    Yes.

122

1    Q    And that you were asked questions by the
2    investigator?
3    A    Yes.
4    Q    Did you ever see any kind of typewritten
5    statement that was produced based upon your conversation
6    with the investigator?
7    A    No.
8    Q    And when was the first time that you saw any
9    such statement?
10   A    At Officer Wallace's deposition.
11   Q    And did you ever sign any statement that was
12   reproduced by any investigator at the Office of Citizen
13   Complaint Review?
14   A    No.
15   Q    Were you ever asked to come in and review
16   your statement in order to sign it?
17   A    No.
18   Q    Did you know that a statement had been
19   prepared?
20   A    No.
21   Q    Did you know that it had been included as a
22   part of your case?

123

1    A    No.
2    Q    Did you know that the Office of Complaint
3    Review had concluded or completed its investigation of
4    your complaint?
5    A    No.
6        MS. RUCKER:  Thank you.
7        I don't have anything further.
8        You have a right to review the transcript.  I
9    don't think the court reporter had any problems
10   understanding you, so at this point we will waive review
11   and that concludes the deposition.
12       MR. JACKSON:  Okay, great.
13       Are you going to hold onto the originals?
14       MS. RUCKER:  We're going to leave the
15   originals to be provided with the court reporter as part
16   of the record.
17       MR. JACKSON:  I, obviously, will have this
18   particular copy of this transcript.
19       THE COURT REPORTER:  Are you ordering a copy,
20   ma'am?
21       MS. RUCKER:  Yes.
22       (Signature waived. Deposition concluded at 6:09 P.M.)

124

1    CERTIFICATE OF NOTARY PUBLIC
2        I, Barbara A. Conner, Registered Professional
3    Reporter, the officer before whom the foregoing
4    proceedings were taken, do hereby certify that the
5    foregoing transcript is a true and correct record of the
6    proceedings; that said proceedings were taken by me
7    stenographically and thereafter reduced to typewriting
8    under my supervision; and that I am neither counsel for,
9    related to, nor employed by any of the parties to this
10   case and have no interest, financial or otherwise, in
11   its outcome.
12       IN WITNESS WHEREOF, I have hereunto set my
13   hand and affixed my notarial seal this 27th day of April
14   2007.
15
16   My commission expires:
17   January 1, 2008
18
19   _____
20       NOTARY PUBLIC
21
22