# Plaintiff's Opposition to Defendants' Motion for Summary Judgment

# Exhibit
# 2

# Defendant Wallace's Deposition

1 (Pages 1 to 4)

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2             DISTRICT OF MARYLAND
 3   LATASHA M. COTTON        :
 4        Plaintiff      :  Case No.
 5   v.                  :  05-1047
 6   DISTRICT OF COLUMBIA,   :
 7   et al.              :
 8        Defendant       :
 9        --------------
10       Deposition of Officer David C. Wallace
11            Silver Spring, Maryland
12           Thursday, April 12, 2007
13               10:30 a.m.
14
15
16
17
18
19   Job No:  1-100368
20   Pages:  1 through 143
21   Reported by:  Patricia G. Koong
22
```

2

```
 1        Deposition of Officer David C. Wallace held at the
 2   offices of:
 3
 4        DuBoff & Associates, Chartered
 5        8401 Colesville Road
 6        Suite 501
 7        Silver Spring, Maryland  20910
 8        (301) 495-3131
 9
10
11        Pursuant to notice, before Patricia G. Koong,
12   Certified Court Reporter and Notary Public in and for
13   the State of Maryland.
14
15
16
17
18
19
20
21
22
```

3

```
 1             A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4        DONNA W. RUCKER, ESQUIRE
 5        DuBoff & Associates Chartered
 6        8401 Colesville Road
 7        Suite 501
 8        Silver Spring, Maryland 20910
 9        (301) 495-3131
10
11
12   ON BEHALF OF DEFENDANTS:
13        DAVID JACKSON, ESQUIRE
14        Office of the Attorney General
15        for the District of Columbia
16        One Judiciary Square
17        441-4th Street, NW
18        Washington, DC  20001
19        (202) 724-6618
20
21   Also Present:  Latasha M. Cotton, Plaintiff
22
```

4

```
 1             C O N T E N T S
 2   EXAMINATION OF OFFICER DAVID C. WALLACE:
 3        By Ms. Rucker          5
 4
 5             E X H I B I T S
 6   (Exhibits attached to the transcript.)
 7   WALLACE DEPOSITION EXHIBITS          PAGE
 8   1    Incident Based Event Report  69
 9   2    Officer/Complainant
10        Witness Statement         120
11   3    Event Chronology          120
12   4    Event Chronology          120
13
14
15
16
17
18
19
20
21
22
```

DEPOSITION OF OFFICER DAVID C. WALLACE
Case 1:05-cv-01047-RMU    Document 27    Filed 07/03/2007    Page 3 of 9
CONDUCTED ON THURSDAY, APRIL 12, 2007

2 (Pages 5 to 8)



Page 5

1 PROCEEDINGS
2 Officer David C. Wallace,
3 having been duly sworn, testified as follows:
4 EXAMINATION BY COUNSEL FOR PLAINTIFF
5 BY MS. RUCKER:
6 Q Officer Wallace, my name is Donna Rucker,
7 I'm an attorney for Latasha Cotton, and we have you
8 scheduled here today to take your deposition. Have
9 you ever had your deposition taken before?
10 A Once before.
11 Q For what kind of matter?
12 A Traffic.
13 Q It was concerning a traffic case?
14 A Juvenile.
15 Q You were not involved in terms of an
16 interested party, you were a witness?
17 A I was a juvenile.
18 Q You were the juvenile?
19 A I was a juvenile.
20 Q Okay. I want to make sure I understand what
21 you're saying. Your deposition was taken when you
22 were a juvenile —

Page 6

1 A Yes.
2 Q Concerning a traffic case?
3 A Yes.
4 Q About how many years ago was that?
5 A Fifteen.
6 Q Okay. Well, you have a little bit of
7 familiarity with how depositions go, but I'll take an
8 opportunity to suggest to you what we're going to do
9 here today is, I will ask you questions and I would
10 like for you to give me a response. And if for some
11 reason the question that I ask, if you're not sure
12 about it or if it's not clear, let me know that and
13 I'll be happy to rephrase it.
14 A Okay.
15 Q I want to make sure that when you give me an
16 answer, it's to the question that I posed.
17 A All right.
18 Q When you do give a response, because we have
19 the court reporter taking down what's being stated,
20 you need to give me a verbal response, because the
21 court reporter has difficulty picking up head nods or
22 head shakes.

Page 7

1 A Right.
2 Q It also is good that I have an opportunity
3 to get the complete question out, and then I will
4 afford you a fair opportunity to give me a complete
5 response. But it become difficult for the court
6 reporter to take down what we're saying if we're
7 speaking across one another; is that fair?
8 A Okay.
9 Q If for some reason you don't understand one
10 of my questions, ask me to clarify the question. And
11 if I do that and you answer it, I'm going to assume
12 that you understood that question; is that fair?
13 A Yes.
14 Q If you need a take a break during the course
15 of the deposition, simply let us know that; I'll be
16 happy to oblige. I just ask that you not do so with a
17 question that's pending; is that all right?
18 A Okay.
19 Q Can you tell me for the record your name and
20 your business address?
21 A First name is David, last name is Wallace,
22 W-A-L-L-A-C-E. I work for Metropolitan Police

Page 8

1 Department, Washington D.C.
2 Q What's that business address for you?
3 A 1805 Bladensburg Road, NE.
4 Q What District is that?
5 A Number 5.
6 Q And have you ever gone by any other names?
7 A No.
8 Q Do you have a middle initial?
9 A C.
10 Q What does that stand for?
11 A Cecil, C-E-C-I-L.
12 Q And there is no junior or senior or II or
13 III?
14 A The IV.
15 Q So your complete name is David C. Wallace,
16 IV?
17 A Yes.
18 Q Have you ever been a member of the military?
19 A No.
20 Q Are you married?
21 A Yes.
22 Q To whom?

49

1    A   Correct.
2    Q   What do you mean by good?
3    A   The area of Mount Olivet Road, there's a lot
4  of street crimes that happen in the area, and I
5  advised him that it was a high-crime area and it would
6  be best for him just to move on.
7    Q   Was there any authority that you had as a
8  police officer to insist that the individual move on?
9    A   I didn't insist nothing. I just advised
10  him.
11    Q   That's not my question. I understand, and
12  the record has that your testimony is that you advised
13  him to move on.
14       I'm asking a different question, and my
15  question is: Did you have any authority on that day
16  to insist that that individual move on?
17    A   Not that I can recall.
18    Q   Did you insist that that individual move on?
19    A   Did I insist? Not that I recall.
20    Q   Isn't that what is alleged in the complaint,
21  however?
22       MR. JACKSON: Objection.

50

1  BY MS. RUCKER:
2    Q   Isn't that what is alleged in the complaint?
3    A   I don't recall reading "insisting."
4    Q   So it's the word, the term "insisting" that
5  you take issue with. Let me rephrase that. Do you
6  recall telling the citizen to move on because you said
7  so?
8    A   No.
9    Q   Did the citizen move on?
10    A   I don't recall if he did or not.
11    Q   Did you have any authority to arrest that
12  individual if he did not move on?
13    A   Not that I recall.
14    Q   Do you know what the resolution of -- do you
15  know what the resolution was of the complaint that he
16  filed?
17    A   No, I don't.
18    Q   Do you recall receiving any discipline for
19  the complaint that was filed by this citizen?
20    A   No, not that I recall.
21    Q   Do you recall receiving any discipline for
22  the complaint filed by Latasha Cotton?

51

1    A   No, not that I recall.
2    Q   Did any officials within the Metropolitan
3  Police Department meet with you regarding the
4  complaint by the citizen that had the taxicab?
5    A   I don't recall.
6    Q   Do you recall giving a statement to the
7  government of the District of Columbia Office of
8  Citizen's Complaints Review regarding the incident
9  with the taxicab?
10    A   I don't remember the exact statement, but
11  yes, I recall.
12    Q   Giving the statement?
13    A   Yes.
14    Q   How about to the Office of Citizen's
15  Complaints Review -- Office of Citizen's Complaints
16  Review concerning the complaint made by Latasha
17  Cotton; do you remember giving that statement?
18    A   Briefly.
19    Q   Are you saying that you recall giving a
20  brief statement?
21    A   I remember giving a statement. I don't
22  remember exactly my statement that I gave.

52

1    Q   Understood. Do you recall with respect to
2  the taxicab incident, was the citizen parked
3  illegally?
4    A   I don't recall if he was or not.
5    Q   I'm going to show you another document that
6  was provided by the District of Columbia as an
7  attachment to the complaint that the taxicab driver
8  made. I just want to ask if you have ever seen this
9  letter that is attached?
10       MS. RUCKER: Counsel, I'll show it to you
11  first.
12       Counsel, is that letter dated?
13       MR. JACKSON: It is dated.
14       MS. RUCKER: What date does it show?
15       MR. JACKSON: Well, I'm not sure. There's
16  three dates, one of which is crossed out. Appears to
17  be 31 of which is crossed out. I'm not sure if the
18  top is actually a date or some other kind of number.
19  9/12.
20       MS. RUCKER: Well, I hope that's not a date
21  'cause we would be living in the future. But the one
22  under it looks like it has 4/30/04; does that look

57

1    himself in the mediation process?
2         MR. JACKSON:  Objection.
3         MS. RUCKER:  I'm only asking does he know.
4         MR. JACKSON:  And you already asked him if
5    he knew why and he said no.
6         MS. RUCKER:  Well, I gave him information
7    now, and I asked him about that.
8         MR. JACKSON:  Objection.
9    BY MS. RUCKER:
10    Q    Do you whether it was a part of the
11    mediation process?
12    A    No, I don't.
13    Q    Okay.  And do you know whether or not the
14    complaint was dismissed on its merits?  In other
15    words, let me rephrase that to you.  Do you know
16    whether the reason for the dismissal was that the
17    Civilian Complaint's Review Board found that there was
18    no merit to the claim?
19    A    I don't recall.
20    Q    Do you recall any action that was taken by
21    you as a result of the complaint made by Latasha
22    Cotton?

58

1    A    I'm sorry.  What now?
2    Q    Do you recall any action that was taken by
3    you as a result of the complaint made against you by
4    Latasha Cotton?
5    A    Not that I recall.
6    Q    Do you recall any action taken by you as a
7    result of the complaint that was made by the taxicab
8    owner?
9    A    No, I don't.
10    Q    Do you have any knowledge of any action that
11    was taken by the Metropolitan Police Department as a
12    result of either of those two complaints?
13    A    No, I don't recall.
14    Q    Can you tell me how is it that you came to
15    arrive at the incident concerning Latasha Cotton in
16    June of '04?
17    A    Vaguely I remember that I was on patrol and
18    I pulled into Capitol Avenue where a large fight was.
19    Roughly 40, 50 people.  People in the street yelling,
20    screaming, fighting.  The vehicle got surrounded; had
21    to stop my vehicle so I wouldn't hit anybody.  I got
22    out and initiated to disperse the crowd.

59

1    Q    Is that all you did?
2    A    I remember taking in a report for Ms. Cotton
3    at that time.  At this point in time I don't remember
4    what that report was for.
5    Q    Is that all that you remember?
6    A    Yes.
7    Q    You said that there was a large group of
8    people, about 40 or 50 people?
9    A    Yes.
10    Q    And you said the people were yelling and
11    screaming and fighting?
12    A    Yes.
13    Q    There were multiple people involved in the
14    fight?
15    A    Yes.
16    Q    About how many?
17    A    I don't recall.  I recall going up on the
18    block and there was numerous people fighting on the
19    street and the sidewalk.
20    Q    And your testimony is that you actually
21    observed individuals involved in hitting each other
22    back and forth?

60

1    A    Yes.
2    Q    More than one set of people?
3    A    Yes.
4    Q    Were males fighting or males and females --
5    let me rephrase that.  Did you see men as well as
6    women fighting?
7    A    I don't recall at this point in time whether
8    they were all men fighting or all women fighting.  I
9    remember going up the block and there were subjects
10    fighting.
11    Q    And what was the race of those individuals
12    that were fighting?
13    A    The race?  Well, I pulled in on the block,
14    all I remember is black people.
15    Q    And why do you say that there were about 40
16    or 50 people on the street?
17    A    There was a large group.  I'm approximating
18    40 to 50 people.
19    Q    But you didn't make a count of any kind?
20    A    No, I did not.
21    Q    What were the people yelling?
22    A    I don't recall.

61

1   Q   What were they screaming?
2   A   **I don't recall.**
3   Q   And you said your vehicle was surrounded?
4   A   **Yes.**
5   Q   The black people surrounded the vehicle?
6   A   **Numerous people, yes.**
7   Q   Did they do anything to the vehicle?
8   A   **Not that I can recall.**
9   Q   Why did they surround the vehicle?
10  A   **I have no idea.**
11  Q   Were you able to get out of the vehicle?
12  A   **Yes.**
13  Q   Even with it surrounded?
14  A   **Once my vehicle got surrounded, I exited and**
15  **I initiated to disperse the crowd.**
16  Q   Okay.  What did you do to initiate the
17  dispersement of the crowd?
18  A   **Used loud verbal commands.**
19  Q   What did you say?
20  A   **I don't recall.**
21  Q   What would you typically say in a situation
22  like that?

62

1   A   **Move on.**
2   Q   Did the crowd move on?
3   A   **Yes, I believe so.**
4   Q   So they all dispersed when you said move on?
5   A   **The majority, yes.**
6   Q   Of the 40 or 50, if you say majority, how
7   many are we talking about dispersed?
8   A   **Approximately half.**
9   Q   What did the others do who remained?
10  A   **I don't recall.**
11  Q   That remained?
12  A   **I don't recall.**
13  Q   Was anyone still surrounding your vehicle?
14  A   **No.**
15  Q   Was anyone still fighting?
16  A   **Not that I recall.**
17  Q   When you got out of your vehicle, you
18  initiated the dispersement -- I don't want to say that
19  you said move along, because you testified you don't
20  recall what you said.  You didn't use a megaphone, did
21  you?
22  A   **No, I did not.**

63

1   Q   Of those individuals who remained, as you
2   stated, were any of them still fighting?
3   A   **Not that I can recall.**
4   Q   Did anyone get injured?
5   A   **Not that I recall.**
6   Q   Did anyone have a weapon?
7   A   **I don't remember at this time, no.**
8   Q   When you arrived and you say your vehicle
9   was surrounded, did you call for backup?
10  A   **Yes, I tried to call for backup a couple of**
11  **times, but I was unable to get across the radio.**
12  Q   Tell me what you mean by that.
13  A   **I keyed the radio up and I asked for**
14  **assistance, to where I could remember twice, but I had**
15  **no response from the dispatcher or any other unit.**
16  Q   And why is it that you allege you called for
17  backup?
18  A   **Why did I call for backup?**
19  Q   Why is it that you are stating here today
20  that you called for backup?
21  A   **Why?**
22  Q   Why.

64

1   A   **Because I was one officer in the middle of**
2   **the crowd of 40, 50 people.**
3   Q   Did you fear for your safety?
4   A   **Yes, I did.**
5   Q   Why?
6   A   **Why did I fear for my safety?  Because there**
7   **was numerous people fighting in the street and I was**
8   **only one officer in the crowd of 40 to 50 people.**
9   Q   So you say you tried about two times to get
10  the dispatcher's attention?
11  A   **Yes.**
12  Q   And did you -- what channel were you using
13  for this?
14  A   **The 5th District police channel.**
15  Q   Would this scenario be equivalent to any
16  training you may have received concerning riots or
17  rioting circumstances?
18  A   **During a protest.  If it was a protest, but**
19  **it wasn't a protest that I recall.**
20  Q   Well, what I'm speaking about is the crowd
21  size and the allegation that you made about the
22  behavior of the people, would that be equivalent to

DEPOSITION OF OFFICER DAVID C. WALLACE
CONDUCTED ON THURSDAY, APRIL 12, 2007
Case 1:05-cv-01047-RMU   Document 27   Filed 07/03/2007   Page 7 of 9

17 (Pages 65 to 68)

65

1  what would be considered a riot or an unruly crowed
2  based on your training?
3      A   The riot training that I received was for
4  demonstrations.
5      Q   What would have been the protocol in a
6  demonstration with unruly people?
7      A   To disperse the crowd.
8      MR. JACKSON: Objection; relevance.
9  BY MS. RUCKER:
10     Q   To do what?
11     A   To disperse the crowd.
12     Q   Which is what you say you did?
13     A   Yes.
14     Q   Did you ever use the TAG channel to get
15  assistance?
16     A   No.
17     Q   Why not?
18     A   Because we don't operate off the TAG Channel
19  as the main dispatch channel.
20     Q   When you say you don't operate it as the
21  main dispatch channel, but it is you a channel that
22  you can use for communication, correct?

66

1      A   Yes, it is.
2      Q   Aside from your testimony that you observed
3  40 to 50 people yelling and screaming and fighting,
4  did anyone make any advance towards you?
5      A   Not that I recall.
6      Q   Did you have to pull your revolver?
7      A   No, I don't remember pulling my duty weapon.
8      Q   Was there any particular thing said to you
9  that caused you to, as you stated, fear for your
10  safety?
11     A   Why was I in fear?
12     Q   No, my question is: Was there anything in
13  particular said to you that caused you to be in fear
14  for your safety?
15     A   Not that I can recall at this time.
16     Q   How long during the time that you were on
17  the scene were you in fear for your safety?
18     A   Until the crowd dispersed.
19     Q   And that's after you had exited the vehicle
20  and initiated the dispersement command?
21     A   Yes.
22     Q   This area that we're talking about where the

67

1  incident occurred --
2      MS. RUCKER:  For the record.  I want to see
3  if we can get an agreement as to the location.
4  BY MS. RUCKER:
5      Q   Would it have been, I think it's 1723
6  Capital Avenue.  Does that sound about right?
7      A   About.
8      Q   What PSA area is that?
9      A   At the time it was 507.
10     Q   507.  And how is it that you were assigned
11  to that area that day?
12     A   I don't recall being assigned.  I'm a police
13  officer.  I travel the 5th District.
14     Q   That's what I wanted to hear.  So you
15  weren't there for a particular assignment, you were
16  just doing a routine patrol?
17     A   As far as I can remember.
18     Q   So my initial question is: How is it that
19  you came to be at the scene?  And what I was trying to
20  ascertain from you is, were you sent to this location
21  based on a radio call from communications putting out
22  a run to that location?

68

1      A   No.
2      Q   Did you have any communications with your
3  fellow officers over the area concerning what you had
4  observed when you arrived at the incident?
5      A   Not that I recall, no.
6      Q   And you were not partnered, riding with a
7  co-worker that day?
8      A   No.  I don't believe so.
9      Q   Do you recall that the individuals in this
10  crowd that you were speaking about were trying to give
11  you information about what may have been going on when
12  you arrived?
13     A   Not that I recall.
14     Q   You don't recall anyone giving you any
15  information?
16     A   No, I don't recall.
17     Q   When you got to this location, at what point
18  did you encounter Latasha Cotton?
19     A   I don't remember.
20     Q   You testified that you came up on the scene,
21  you saw the people that appeared to be yelling,
22  screaming, and fighting, you made a request to

DEPOSITION OF OFFICER DAVID C. WALLACE
CONDUCTED ON THURSDAY, APRIL 12, 2007
Case 1:05-cv-01047-RMU    Document 27    Filed 07/03/2007    Page 8 of 9

18 (Pages 69 to 72)

69

1    disperse. Did you have any contact with Ms. Cotton
2    before you made a request to disperse?
3        A    Not that I recall.
4        Q    Do you recall grabbing Ms. Cotton and
5    throwing her down on the ground?
6        A    I don't recall that, no.
7        Q    How about placing her in handcuffs?
8        A    No, not at this point in time I don't recall
9    that.
10       Q    Is it fair to say that your recollection or
11   memory of this incident was better closer to when it
12   happened than it is today?
13       A    Yes.
14       Q    Do you recall Ms. Cotton saying anything to
15   you at the scene of the incident?
16       A    No, not really. Vaguely remember the
17   situation.
18           MS. RUCKER: Let me mark this as deposition
19   Exhibit 1.
20           (Exhibit Number 1 was marked for identification
21   and was attached to the transcript.)
22

70

1           MS. RUCKER: Let me show this to you,
2    Counsel.
3           Counsel, when you've have an opportunity,
4    can you show that to the witness.
5           MR. JACKSON: I would rather him actually
6    see the one that's has been marked by the court
7    reporter.
8           MS. RUCKER: It's the exact duplicate of the
9    document.
10          MR. JACKSON: It's okay.
11          MS. RUCKER: No shakenary here, I assure
12   you.
13          Officer, Wallace, once you've had an
14   opportunity to review the document, let me know.
15       A    Okay.
16   BY MS. RUCKER:
17       Q    Can you identify that for the record?
18       A    It's a report that I took in for Ms. Cotton
19   involving an assault with a deadly weapon, a knife.
20       Q    And what is the number of this report, what
21   kind of report is this?
22       A    It's an offense report.

71

1        Q    And does it go by any number in the
2    department, like a 251 or --
3        A    Yes, it's a PD251.
4        Q    PD251?
5        A    Yes, and PD252.
6        Q    252. Okay. And having reviewed this
7    document, does it refresh your memory about any
8    conversation you may have had with Ms. Cotton at the
9    scene of this incident?
10       A    What I wrote in the report.
11       Q    What did you write in the report?
12       A    "Ms. Cotton and suspect engaged in verbal
13   altercation. When" --
14       Q    Just for the record, because it's important
15   to read what's in the document --
16          Can you open that back up, sir.
17       A    Sure.
18       Q    Just read it as you have it stated. I know
19   you were somewhat paraphrasing, but just for the
20   record, can you read it as it's stated there?
21       A    Yes. It states, "C1 states her and S1
22   entered in a verbal altercation when S1 pulled a knife

72

1    from her shorts and stated 'Come on.' C1 stated to me,
2    the undersigned, "When you pulled up on the block, she
3    ran somewhere.'"
4        Q    Okay. Now, C1 would be who according to the
5    report?
6        A    The complainant, Ms. Cotton.
7        Q    And S1 would be who?
8        A    S1 is one is listed in the 252, the PD252,
9    and the suspect's last name would be Robertson, first
10   name Denise.
11       Q    This report that you prepared was a result
12   of your encounter at the incident, right? Your
13   presence at the incident, correct?
14       A    Correct.
15       Q    And according to this report, would there
16   have been any reason for you to handcuff Ms. Cotton?
17       A    I don't recall at this particular time.
18       Q    You don't recall what?
19       A    I don't recall any reason at this time to
20   handcuff Ms. Cotton.
21       Q    But what I'm asking you to do is
22   specifically base your opinion that you are providing

DEPOSITION OF OFFICER DAVID C. WALLACE
Case 1:05-cv-01047-RMU  Document 27  Filed 07/03/2007  Page 9 of 9
CONDUCTED ON THURSDAY, APRIL 12, 2007

30 (Pages 117 to 120)

117
1  called them about your presence at the scene of the
2  incident that day?
3      A   No, not that I can recall at this time.
4      Q   I've asked you about a number of reports,
5  and I don't want to be redundant, but this one
6  pertains to any of the officials who may have come to
7  Ms. Cotton's home.  Do you recall being asked to
8  submit anything in writing by any of those officials?
9      A   No, not that I recall.
10     Q   Did you have knowledge of the fact that
11  Ms. Cotton had made a call to 911 to make a complaint?
12     A   Not that I recall at this time, no.
13     Q   Your first time learning that is today?
14     A   What's that?
15     Q   That she made a call to complain about your
16  actions at the scene of the incident?
17     A   Let's see.  I've been to CCRB --
18     Q   So it's your testimony that you learned
19  about the fact before CCRB?
20         MR. JACKSON:  Objection to the extent that
21  CCRB is not part of the police department.
22         MS. RUCKER:  I'm only using -- let me

118
1  rephrase the question, and we can have the court
2  reporter read it back.
3         (Record read.)
4      A   I wasn't notified that she called 911 or
5  311.
6  BY MS. RUCKER:
7      Q   311.
8      A   Or whatever number that she called.
9      Q   Until when?
10     A   I don't recall.
11     Q   You don't recall ever learning that she
12  called 911?
13     A   I don't recall exactly how I learned about
14  it.
15     Q   But you did know it prior to coming here
16  today; is that correct?
17     A   Yes.
18     Q   Did you ever indicate that -- did you ever
19  testify or indicate to anyone, any official in the
20  police department or any agency, that you believe that
21  the reason Ms. Cotton was going to leave her apartment
22  had to do with the smell of gas in her apartment unit?

119
1      A   I really don't recall at this time.  I don't
2  recall at this time.
3      Q   Or an allegation that Ms. Cotton tried to
4  assault you?
5      A   I never alleged that Ms. Cotton tried to
6  assault me.
7      Q   Did you use profanity at the scene of the
8  incident that's the subject of this case?
9      A   No, not that I recall.
10     Q   Did Ms. Cotton use profanity?
11     A   Not that I recall.
12     Q   Do you recall being investigated by an
13  investigator by the name of Ms. Alpha Griffin based on
14  the complaint by Ms. Latasha Cotton?
15     A   Yes, Ms. Griffin works for, I believe, I
16  believe Ms. Griffin works for CCRB.
17     Q   Can you tell me about that interview?
18     A   I really don't recall the interview.  It's
19  been quite a while.
20     Q   But you remember Ms. Griffin?
21     A   Yes.
22     Q   Why is that?

120
1      A   Why do I remember her?
2      Q   Yes.
3      A   Because she works for CCRB.
4      Q   And that's the only reason?
5      A   I remember a brief interview with her, but I
6  don't exactly remember what the interview persists of.
7      Q   Was Ms. Cotton injured while she was at the
8  scene of this incident speaking to you?
9      A   Not that I recall.
10     Q   Was she crying?
11     A   I don't recall.
12     Q   Was she ever sitting on the ground at any
13  point?
14     A   Not that I remember, no.
15         MS. RUCKER:  Off the record.
16         (Break taken.)
17         I was looking for the answers to
18  interrogatories.  Let's mark this as Deposition -- is
19  it 2?
20         (Exhibit Numbers 2 through 4 were marked for
21  identification and were attached to the transcript.)
22