# Plaintiff's Opposition to Defendants' Motion for Summary Judgment

# Exhibit 7

# Deposition of Ida George Houser (Vol. I) Dated April 17, 2007

DEPOSITION OF LT. IDA HOUSER, V. I
CONDUCTED ON TUESDAY, APRIL 17, 2007

1 (Pages 1 to 4)

---

**Page 1**

```
  1       IN THE UNITED STATES DISTRICT COURT
  2         FOR THE DISTRICT OF COLUMBIA
  3  -----------------------------x
                                  :
  4  LATASHA M. COTTON            :
                                  :
  5       Plaintiff               :
                                  :
  6       v.                      :   Case No.
                                  :
  7  DISTRICT OF COLUMBIA         :   1:05CV0147(RU)
                                  :
  8  GOVERNMENT, et al.           :
                                  :
  9       Defendants              :
                                  :
 10  -----------------------------x
 11      Rule 30(b)(6) Deposition of DISTRICT OF COLUMBIA
 12           By and through its designee
 13                LT. IDA HOUSER
 14                   Volume 1
 15             Silver Spring, Maryland
 16             Tuesday, April 17, 2007
 17                   6:37 p.m.
 18  Job No: 1-101504
 19  Pages 1 - 132
 20  Reported by: Donna Q. Buckhaults
 21
 22
```

---

**Page 2**

```
  1       Deposition of LT. IDA HOUSER, held at the
  2  offices of:
  3
  4       DUBOFF & ASSOCIATES, CHARTERED
  5       8401 Colesville Road
  6       Suite 501
  7       Silver Spring, Maryland 20910
  8       (301) 495-3131
  9
 10
 11       Pursuant to agreement, before Donna Q.
 12  Buckhaults, Registered Professional Reporter and
 13  Notary Public of the State of Maryland.
```

---

**Page 3**

```
  1              APPEARANCES
  2
  3  ON BEHALF OF THE PLAINTIFF:
  4       DONNA W. RUCKER, ESQUIRE
  5       DUBOFF & ASSOCIATES, CHARTERED
  6       8401 Colesville Road
  7       Suite 501
  8       Silver Spring, Maryland  20910
  9       (301) 495-3131
 10
 11
 12  ON BEHALF OF THE DEFENDANTS:
 13       DAVID JACKSON, ESQUIRE
 14       OFFICE OF THE ATTORNEY GENERAL
 15       One Judiciary Square
 16       441 Fourth Street, Northwest
 17       Suite 600
 18       Washington, D.C.  20001
 19       (202) 727-3500
 20
 21
 22       ALSO PRESENT:  Latasha M. Cotton
```

---

**Page 4**

```
  1              CONTENTS
  2  EXAMINATION OF LT. IDA HOUSER          PAGE
  3       By Ms. Rucker                       5
  4
  5
  6              EXHIBITS
  7         (Retained by Counsel)
  8  HOUSER DEPOSITION EXHIBIT               PAGE
  9   1   Rule 30(b)(6) Deposition Notice of  29
 10       the District of Columbia
 11   2   Lt. Houser's Statement to CCRB      70
 12   3   Incident-Based Event Report         85
 13   4   MPD Radio Run Tape Transcript      122
 14       Case Number 04-0273
```

Case 1:05-cv-01047-RMU    Document 27-7    Filed 00/03/2007    Page 3 of 6
DEPOSITION OF LETITIA HOUSE, VOL. 1
CONDUCTED ON TUESDAY, APRIL 17, 2007

14 (Pages 53 to 56)

Page 53

1  A. She fled the scene.
2  Q. Fled the scene at what point?
3  A. She fled the scene according to Officer
4  Wallace.
5  Q. At what point?
6  A. Prior to my arrival.
7  Q. So Officer Wallace told you that the person
8  that the complainant or Ms. Cotton was complaining
9  about had left the scene?
10 A. She fled the scene prior to my arrival.
11 Q. And that's what Officer Wallace told you?
12 A. Yes.
13 Q. Did he have a description of her?
14 A. I don't recall.
15 Q. Did you knock on her door in the building?
16 A. No.
17 Q. Did Officer Wallace knock on her door in the
18 building?
19 A. I don't recall.
20 Q. When you indicate that Officer Wallace told
21 you that she fled the scene, did he say which way she
22 ran?

Page 54

1  A. I don't recall.
2  Q. Is there any particular reason why neither
3  you or Officer Wallace asked any of the individuals
4  who were outside any questions?
5      MR. JACKSON: Objection as to what Officer
6  Wallace might have asked. I don't think you set
7  a foundation for her of whether she has any
8  knowledge for that.
9  BY MS. RUCKER:
10 Q. You can answer.
11 A. Officer Wallace and I discussed why I was
12 there for the complaint.
13 Q. Discussed what?
14 A. Why I was there for the complaint.
15 Q. I'm not sure what you mean.
16 A. We discussed the complaint.
17 Q. Which was?
18 A. The reason for me being called up there.
19 Q. And that was?
20 A. We discussed the reason for me being called
21 back up there. I don't remember the question. Ask me
22 the question again.

Page 55

1  Q. Okay. I asked you was there any particular
2  reason why neither you or Officer Wallace talked to
3  any of the people that were outside, and you said --
4  A. Me as a supervisor, I talked to the officer
5  about the complaint.
6  Q. And the complaint was?
7  A. The complaint was why the other young lady
8  did not get arrested.
9  Q. And what did he tell you about that?
10 A. The other young lady fled the scene.
11 Q. Did Officer Wallace indicate to you that he
12 had tried to locate her?
13 A. I don't recall.
14 Q. Did either of you -- do you recall going and
15 trying to locate her?
16 A. I did not try and locate anyone but the
17 complainant.
18 Q. Can you tell me your understanding of what
19 happened on June 7th of 2004?
20 A. My understanding is that there was a
21 disorderly fight outside. Officer Wallace was riding
22 past and saw the fight going on. He ran in. He

Page 56

1  grabbed someone. The complainant then stated that the
2  neighbor had a knife or something and tried to stab
3  her and that she was upset that Officer Wallace didn't
4  arrest the other person.
5  Q. Anything else?
6  A. When I arrived on the scene, we went up to
7  Ms. Cotton's apartment or the complainant's apartment.
8  We discussed filing an official complaint. I believe
9  the complainant was saying she had to go to work or
10 something, that she couldn't come up to the station
11 right then and there. We discussed being that there
12 was a serious gas leak, that we needed to get that
13 resolved, and I believe we called the fire department,
14 and that's all I can recall off the top of my head --
15 Q. Who called --
16 A. -- without the complaint.
17 Q. Okay. Who called the fire department?
18 A. I don't remember if it was myself or Officer
19 Wallace, but one of us, we called the fire department.
20 Q. Did they come?
21 A. I believe they did. I don't remember seeing
22 if they did, physically being there to see that they

Page 61

1 for backup, who are you speaking to?
2   A. The dispatcher.
3   Q. At communications?
4   A. Yes.
5   Q. What about a TAC channel? Can you use that?
6   A. Usually you don't unless the zone has heavy
7 traffic, communication traffic, unless you can't get
8 on the zone.
9   Q. So what that means is if you're trying to
10 get through to communications and you can't get in,
11 you should use the TAC channel?
12   A. Well, normally the TAC channel is not
13 monitored like it is the regular zone.
14   Q. But other officers can hear that; correct?
15   A. The other officers that are monitoring the
16 zone because usually you only go to TAC if you're
17 called to TAC.
18   Q. But I'm saying it's also sometimes monitored
19 by other officers; correct?
20   A. Sometimes.
21   Q. So let me understand. If you're not able to
22 get in, trying to get into communications, you should

Page 62

1 do what?
2   A. Rephrase the question.
3   Q. You testified earlier that you should try to
4 call into communications unless there's heavy traffic,
5 I believe you said. What do you do if there's heavy
6 traffic?
7   A. Well, it depends on the gravity of the
8 situation.
9   Q. What if you are in fear of your safety or
10 your life?
11   A. There's other options. You can go to
12 another zone and try and get on there.
13   Q. Another what?
14   A. Another radio zone and try to get on there.
15   Q. Would you be speaking to communications
16 then?
17   A. Yes.
18   Q. So you can get to communications in another
19 zone?
20   A. Or you can call the priority or you can
21 call -- excuse me for one second. Give me a time out.
22   Q. You need a break?

Page 63

1   A. Yeah, I need a small break.
2     (Recess taken from 8:02 p.m. until
3 8:25 p.m.)
4   Q. Call priority and you can call what?
5   A. I don't remember.
6   Q. Don't remember?
7   A. I don't remember. Thank you.
8   Q. What is calling priority? What is that?
9   A. You call priority to get across the zone
10 unless there's another priority you're working because
11 sometimes they can't hear you or they can't --
12   Q. Okay.
13   A. That's why I think since that incident we
14 got the radio with the emergency buttons after that.
15   Q. After what?
16   A. After the emergency we got new radios. Now
17 there's an emergency button that shuts down the zone
18 if you press it because of people calling priority and
19 not being able to get on the zone.
20   Q. Do you know whether there was an
21 investigation done by any MPD official? I think we
22 talked about what you may have done, but anyone else

Page 64

1 regarding the complaint that Latasha Cotton had?
2   A. I'm aware that CCRB did do an investigation.
3 At least they called me for a statement for an
4 investigation.
5   Q. And anyone else? You said IAD. What is
6 that?
7   A. Internal Affairs Division, IAD.
8   Q. And Internal Affairs did an investigation in
9 this case?
10   A. I'm not sure. I don't remember if I saw it
11 in the package or not.
12   Q. Okay. You said you gave a statement. Do
13 you recall whether you gave a statement to Internal
14 Affairs?
15   A. I remember giving a statement to CCRB. I
16 don't recall if I gave one to Internal Affairs.
17   Q. Does CCRB investigate complaints where
18 Ms. Cotton would have alleged that another citizen had
19 done something to her?
20   A. No.
21   Q. So if CCRB is investigating a complaint, is
22 it fair to say that the complaint is against the

Case 1:05-cv-01047-RMU   Document 27-7   Filed 07/03/2007   Page 5 of 6
DEPOSITION OF LT. IDA HOUSTON
CONDUCTED ON TUESDAY, APRIL 17, 2007

17 (Pages 65 to 68)

## Page 65

1 police officer?
2    A.  Yes.
3    Q.  So then Ms. Cotton's complaint would have
4 been against the police officer?
5    A.  Yes.
6    Q.  Do you know which police officer?
7    A.  Officer Wallace.
8    Q.  And prior to CCRB contacting you about
9 Ms. Cotton's complaint against Officer Wallace, is it
10 your testimony that you did not know that Ms. Cotton
11 had a complaint against Officer Wallace?
12    A.  Re-ask the question because I'm not really
13 sure.
14    Q.  Is it your testimony that prior to being
15 notified by CCRB that Latasha Cotton had filed a
16 complaint against Officer Wallace, is it your
17 testimony that you did not know that Ms. Cotton had
18 any complaints against Officer Wallace for his
19 behavior?
20    A.  It is my testimony that I told Ms. Cotton to
21 go to the station and file a written complaint. After
22 that, I'm not really sure what happened.

## Page 66

1    Q.  No, I understand that part. But if I
2 understand you correctly, you stated when you told her
3 to go file a complaint, she was complaining about
4 someone not being arrested immediately. What I'm
5 speaking about now is complaints about Officer
6 Wallace.
7    A.  Okay.
8    Q.  So I'm asking you, is your first time
9 learning that Latasha Cotton had complaints about
10 Officer Wallace's behavior on June 7th of 2004?
11    A.  Her complaint was about Officer Wallace not
12 arresting the other person. Yes, I was aware of that.
13    Q.  Okay. But you just put words in my mouth
14 that I didn't have, so let me rephrase the question.
15       We'll back up for a second and talk about
16 when you indicated that you said Ms. Cotton wanted to
17 complain because the other lady was not immediately
18 arrested.
19    A.  Yes.
20    Q.  That's what you said?
21    A.  Um-hmm.
22    Q.  Are you saying now that Ms. Cotton wanted to

## Page 67

1 complain because Officer Wallace did not immediately
2 arrest --
3    A.  Yes.
4    Q.  -- the lady? Okay. So what is it that
5 Ms. Cotton told you that concerned her about Officer
6 Wallace's failure to immediately arrest the other
7 lady?
8    A.  I don't remember specifics without my
9 statement.
10    Q.  Is it fair to say that she had complaints
11 about what Officer Wallace didn't do?
12    A.  Yes.
13    Q.  Did she have complaints about things that
14 Officer Wallace did to her?
15    A.  I don't recall. I don't recall.
16    Q.  Okay.
17    A.  Not without my statement.
18    Q.  If Latasha Cotton had complained to you at
19 her home that day about things that she believed
20 Officer Wallace did do to her that she felt was not
21 appropriate, could you have taken any disciplinary
22 action against Officer Wallace if you investigated and

## Page 68

1 determined that she was correct?
2    A.  That's a very broad question.
3    Q.  I can rephrase it if you want.
4    A.  Please.
5    Q.  Could you have disciplined Officer Wallace
6 if what Latasha Cotton complained about in terms of
7 what Officer Wallace did to her was, in fact, true?
8    A.  About not taking an arrest?
9    Q.  Not making an arrest?
10    A.  You can always discipline an officer if a
11 complaint is found to be not true. Or not personally
12 disciplined, but write them up for disciplinary
13 action.
14    Q.  So Officer Wallace could have been written
15 up by you if it was determined that what Ms. Cotton
16 complained about was, in fact, so?
17    A.  If there was grounds for a complaint, yes.
18    Q.  Would there be grounds for a complaint if
19 Ms. Cotton is correct that Officer Wallace had failed
20 to arrest the person that had wielded a knife at her?
21    A.  Ask me again. I'm sorry.
22    Q.  Sure.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

Case 1:05-cv-01047-RMU  Document 27-7  Filed 07/03/2007  Page 6 of 6
DEPOSITION OF LETITIA T. HOUSTON
CONDUCTED ON TUESDAY, APRIL 17, 2007

29 (Pages 113 to 116)

113

1  what he told you?
2  A. Yes.
3  Q. Anything else?
4  A. I don't understand.
5  Q. Anything else that caused you to reach that
6  conclusion or was it simply based on the fact that
7  Officer Wallace told you?
8  A. It was based on there was other folks
9  outside. It appeared that there was some type of
10  something going on outside.
11  Q. I'm sorry. There was --
12  A. There was some type of altercation or
13  something. There were people outside, a large amount
14  of people outside as well.
15  Q. No use of force report was completed in this
16  case; is that correct?
17  A. No.
18  Q. If Officer Wallace had grabbed Ms. Cotton in
19  the manner that I suggested, pushing her forward and
20  putting her feet out, clipping her feet from under her
21  causing her to hit the ground, would he have to
22  complete a use of force report based on policies and

114

1  procedures in the MPD?
2  A. I'm stopping because there's several reasons
3  to complete a report now.
4  Q. I'm only asking whether that would have been
5  one of them, the example I gave.
6  A. Back then or now?
7  Q. Back then, 2004, what we're talking about.
8  A. I'm not sure whether the use of force
9  policies that we have in effect now was in effect back
10  then because the use of force policies have changed.
11  Q. When did they change?
12  A. I don't have an exact date for you.
13  Q. Just an estimate. The year would be good
14  enough.
15  A. I don't have an estimate. I just know it
16  changed. We have to complete several uses of force
17  for different reasons.
18  Q. I've been provided use of force orders dated
19  February -- use of force orders for October 7, 2002.
20  Is it your testimony that the orders changed since
21  2002?
22  A. Yes. We now have to complete use of force

115

1  reports for more reasons, different reasons.
2  Q. Than before?
3  A. Yes. We used to have handcuff. We have
4  forcible handcuffing. We have different criteria now
5  than we did then to document use of force.
6  MS. RUCKER: Counsel, I would just say that
7  if the discovery that we were provided is not --
8  is discovery that would be removed at this point,
9  then --
10  MR. JACKSON: Those should be what would
11  have been in effect June of 2004. Probably not
12  the most current, but --
13  MS. RUCKER: No, I'm not looking for most
14  current. I'm only looking for those that would
15  have been in effect in '04. The lieutenant has
16  testified that she does not believe that the ones
17  that were in effect in '02 were in effect in '04.
18  A. No. What I testified is I don't know. I
19  don't remember when it changed or if it's the same
20  ones we have now.
21  Q. Okay. But you were supposed to know that
22  coming here today. That's one of the ones on the

116

1  paper that specifically talks about presenting someone
2  who is familiar with the policies and procedures then
3  in effect at the time.
4  MR. JACKSON: I'll check, counsel, but I'm
5  pretty sure that those are the ones that were in
6  effect at the time and I'll double-check that
7  those are the ones.
8  MS. RUCKER: Okay. Because it's actually
9  Number 1 on the deposition list. Okay? Let me
10  just see if I can understand from the witness
11  because I do have questions about use of force.
12  BY MS. RUCKER:
13  Q. Are you saying that you have no knowledge of
14  what policies and procedures were in effect in 2004?
15  A. No, I'm not saying that. I'm saying --
16  Q. Well, let me ask you some questions, then,
17  about that.
18  In 2004 would a use of force report have to
19  be completed by Officer Wallace if you took Latasha
20  Cotton by the back of the head, pushed her forward,
21  stuck his foot out and clipped her feet from under her
22  causing her to hit the pavement?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664